# CHARLESTON.

## STATE v. BICKLE.

Submitted June 13, 1903. Decided November 14, 1903.

1. EVIDENCE.

Evidence that the defendant while confined in jail had an opportunity to escape and declined to do so, is not admissible. (p. 611.).

2.　TRIAL—*Prejudice—Appellate Court.*
　　Where a defendant has had a full, fair trial upon indictment
for a felony, the appellate court will not reverse the judg-
ment and set aside the verdict rendered after such trial, for
an error in not enforcing a rule of practice in the trial of the
case, when it clearly appears from the whole case that the
rights of the defendant could not possibly have been prejudiced
or effected thereby. (p. 612.) .

Appeal from Circuit Court, Braxton County.

Action by the State of West Virginia against Chris Bickle. .
Judgment for the State and plaintiff appeals.

*Affirmed.*

ATTORNEY GENERAL, for defendant in error.

MORRISON & RIDER and HIMER & KELLEY, for plaintiff in
error.

McWHORTER, PRESIDENT:

Chris Bickle was convicted of murder in the first degree on
the 15th of September, 1902, in the circuit court of Braxton
County upon an indictment therein found by the grand jury
for the murder of his wife, Salina Bickle, in April, 1902, to
which judgment the prisoner obtained a writ of error. The
second assignment of error was to the action of the court in
overruling the demurrer to the indictment and the motion
to quash the same. The indictment was framed after the form
prescribed in the statute for indictment for murder and con-
formed very closely thereto. This question has been so well
settled and so often passed upon that I deem it unnecessary to
give it further notice here, indeed it does not seem to be at all
relied upon by the defendant's counsel.

The first assignment of error is that the court erred in giv-
ing to the jury, at the instance of the State, the five several
instructions set out in bill of exceptions No. 1, which instruc-
tions are as follows:

### NO. 1.

"The court instructs the jury that if they have a reasonable
doubt of the defendant's guilt they must acquit him, but a
doubt to authorize an acquittal must be a substantial doubt

arising from the insufficiency of evidence and not a mere possibility of innocence, and a reasonable doubt is that state of the case which after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction to a moral certaincy of the truth of the charge.

## NO. 2.

The court instructs the jury as a matter of law that in considering the case the jury are not bound to go beyond the evidence to hunt up doubts nor must they entertain such doubts as are merely chimerical or conjectural. A doubt to justify an acquittal must be reasonable and must arise from a candid and impartial investigation of all the evidence in the case, and unless it is such that were the same kind of doubt interposed in a graver transaction of life it would cause a reasonable and prudent man to hesitate and pause it is insufficient to authorize a verdict of not guilty. If after considering all the evidence the jury can say they have an abiding conviction of the truth of the charge they are satisfied beyond a reasonable doubt.

## NO. 3.

The court instructs the jury that a reasonable doubt is not a vague or uncertain doubt and that what the jury believe from the evidence as men they should believe as jurors.

## NO. 4.

The court instructs the jury that a doubt produced by undue sensibility in the mind of a juror in view of the consequences of his verdict is not a reasonable doubt and the juror is not allowed to create sources of material for doubt by resorting to trivial or fanciful suppositions and remote conjectures as to a possible state of facts differing from that established by the evidence. The oath of a juror imposes on him no obligation to doubt where no doubt would exist if no oath had been administered. When a circumstance is of a doubtful character the accused is entitled to the benefit of the doubt. If, however, all the facts established necessarily lead the mind to the conclusion that the defendant is guilty though there be a bare possi-

bility merely, not supported by some good reason therefor that he is innocent, the jury should find him guilty. A juror's duty to the State, to society and to himself is equally sacred to hold for conviction if he has an abiding satisfaction of defendant's guilt and if after deliberation no juror is possessed of any good reason to doubt the defendant's guilt it is the duty of the jury to find him guilty.

## NO. 5.

The court instructs the jury that they are the sole judges of the evidence and that they may believe or refuse to believe any witness and that when passing upon the credibility of any witness they may take into consideration his interest in the matter in controversy, the reasonableness or unreasonableness of his statement, his bias or prejudice in the matter, if any appear and his demeanor upon the witness stand."

The first four of these instructions are upon the question of reasonable doubt. This question of "reasonable doubt" has been discussed so many times and has been so much "defined" that it would seem that the juror of average intelligence would be able to know what is meat by it, even though he might not be able to give anything like a technical definition. It can hardly be necessary to present in so many phases the meaning of "reasonable doubt." Jurors when impannelled are sworn to well and truly try and true deliverance make between the State and the prisoner at the bar, and the State is bound to prove all the material allegations contained in the indictment and failure on any one point necessary to be proved, to satisfy the jury beyond a reasonable doubt, the prosecution fails. In section 12, Underhill on Criminal Evidence, and note 5, page 17 and cases there cited, especially in *State* v. *Talmage,* 107 Mo. 543, 557; (17 S. W. 990,) and in *Cross* v. *State,* 132 Ind. 65, (31 N. E. 473), the question is very thoroughly discussed, and the instructions 1, 2, 3 and 4 come within the purview of the rulings and definitions therein. While No. 3 is in the exact words of instruction No. 5 approved in *State* v. *Dickey,* 48 W. Va., 326, and the State's instruction No. 5 in case at bar is substantially the same as No. 4 in said *Dickey Case.* The court did not err in giving the instructions for the State set out in bill of exceptions No. 1.

The third assignment is that the court erred in refusing to set aside the verdict of the jury as contrary to the law and the evidence and because of the admission of improper evidence and the rejection of proper evidence, as set out in further bills of exceptions.

Chris Bickle, together with his wife, his son Hanse Bickle, a young man about 19 years of age, his daughter Della, about 21 years of age and Ida, younger, and his son Sullivan Bickle, about 10 years of age, and a child about 11 months of age, and Jane Bickle, the mother of the prisoner, who was 81 years of age, and who had been with them in their house some two weeks, occupied a house which contained four rooms. The old mother, Jane, slept in a room by herself in the back end of the house, the room next to her was occupied by the four children, the two sons sleeping in one bed and the two daughters in the other, next to their room was the dining room and beyond the dining room, at the front of the house, was the room occupied by Chris Bickle, his wife, Salina, and the babe. All four of the rooms opening into each other. On the night of the sixth of April, after the whole family had retired, about ten or eleven o'clock, Mrs. Salina Bickle was shot in the head. The shot woke up Hanse and the old woman, Jane. Hanse said he heard some one pass his bed and called to Della to know whether she was up. Jane called to know whether there was a shot fired' or not. Some of the children said they heard their father call to their mother and he called to them to bring a light into the room that their mother was dead or couldn't talk, or something to that amount. There is a conflict in the evidence of the mother of Bickle and his children as to who got into the room first; but a lamp was lighted and it was found that Mrs. Bickle had been shot, the ball entering the right eyebrow ranging a little downward and a little inward, as stated by Doctor Vermillion who made the examination. The bed was standing in the corner of the room with the head against one wall and the side against another. There is no conflict of testimony as to the position occupied by Bickle and his wife and the child. Bickle was behind next to the wall, his wife in front with her right side to him and the child lying on her left arm in front of both of them. When found she was lying nearly on her back slightly turned to the left side, her head elevated a little above

the level of the body upon the pillow. When they retired a rifle gun was in a rack on the wall over the head of the bed. The face of the woman and her nightcap were powder burnt and her eyebrows and eyelashes were burnt off. There was no other wounds or marks of violence upon the woman's body. the doctor, Vermillion, who first made the examination, testified that "Her eyelashes and eyebrows were burnt off and some powder burns on the lower part of her eye, and that the nightcap she had on was powder burnt." The doctor testified that there were no indications of any struggle on the part of the woman. He also stated that from the range of the bullet the shot must have been fired from the right side and of course above the level of the body, and that the shot was at short range and he thinks that the gun could not have been more than three or four feet from her head. The gun which had been hanging in the rack at the head of the bed was gone. Hanse called attention to the fact that the gun was not in its place. Hanse says that when he said the gun was gone that "Pap said lets look and see if it had fallen down and we looked." "He says Law—children that has been somebody meant to kill me and has killed your mother, and he says could that have been Ike Lake done that, and Della says that if it has been any one that has done it you can track them it rained last night and there would be tracks out there and we went out to track them and Ida saw the gun out in the yard." He didn't have his clothes on, yet. "He fell down to the gun and went to pick it up and just raised back up and didn't take it up and walked into the house and said mother did you kill my wife? And she said no I didn't Chris and he said I fear you did and she said what makes you think that Chris? And I don't recollect what he said. I don't know that he said anything to her." He and Hanse then put their clothes on and "went to let somebody know that mother was killed." Hanse says "We went to Ira Cutlips." Pap went there on the porch and told Ira that the old woman had killed his wife. W. I. Cutlip and George D. Marple, L. L. Browning, E .G. Robinson went with them to the house Cutlip thinks when they came to the house Chris said, if I understood what he said right, that "somebody had killed his poor wife and he was lying in the bed behind her. He said the crack of the gun did not wake him but the cry of the child did."

And then went on to recite what Chris said about trying to wake his wife. And witness's wife said "Chris who do you think might have done it, and he said I think it was that old woman." "Who did he mean by that old woman?" "That was his mother, the way I understood it. I thought it was his mother that he had reference to. My wife said I recon not Chris, or something like that. Yes said he, Julia Ann you don't know that old woman as I know her. She knew that me and Hanse had been out coon hunting two nights and were very sleepy. He wanted me to go up with him immediately when he came there." "Before you get to that, Did he say anything in that conversation or at the house about the gun with which she was shot being out there in the yard. ?" "He said Hanse's gun was found out in the yard. He didn't say that Hanse's gun had shot her pint blank. I don't think he said that. He said they found Hanse's gun out in the yard. I think that was about the sum and substance that he said there at home, there on the porch. He wanted me to go immediately, and I declined and said I could not go. I calls on one of my sons and grand-sons, and they goes down to George Marple's and George gets up and goes down to Marple's store, which is close to my house, and we called on Mr. Browning there, who clerks for Mr. Marple. We all started down there, and when we gets pretty near the house, I said, If Chris knows where that gun is boys, we had better not go over that gun, and nobody said anything, so we walked on through the same ground where the gun proved to be lying in. I didn't see it myself. We went to the upper end of the house and come on the porch. Chris went in before and George Marple next and me after him, and then I think Mr. Len Browning was after me or Mr. Robinson one or the other. I think both was right behind me. We came in close to where she lay, and his mother was sitting in the right hand corner to the right as we went in and he said something to her and she said something back, but I never heard what it was, and he drew a chair and I heard him swear he would kill her or knock her brains out or something, and drew the chair up, and George Marple grabbed the chair. I said, Mr. Bickle be quiet, be quiet, the stiller you are, the better it will be. He just let the chair down. He said, Mr. Marple, turn that handkerchief down and look at her. Mr. Marple

was a little slow about turning it back, and I looked over and said, that some one had been in the back there where Mr. Bikel said he was lying, and George said Yes, there is his nest, and I looked and it looked like someone lay in behind her. We went out of the house, and went above the house, me and Mr. Marple to have a little talk, and Mr. Bickel followed us out up there, and made some remark up there about his mother doing it. Said she had done it. Elvin Robinson stepped up and said Chris, you had better be still, it will be better for you and I said, Chris, you had better be still, you had just better be quiet. We then come back to the end of the porch again and walks in the house, and then we come out of the house again, and steps off the porch, me and Mr. Marple, and his oldest daughter, Della, comes out on the porch and said, Men, look in the gun and see if the cartridge is fired. I said to Mr. Marple, we had best not touch the gun, but he picked up the gun, and "countered" right smart with it, a right smart little bit before he got this cap turned around or raised up. Mr. Beckel stepped off the porch and I disremember whether Mr. Bickel or Mr. Marple, which one, pulled the cartridge out with their thumb nail or finger one, but one of them took it out of the gun. George Marple had it in his hand. I took it up to see if there was any ball in this hull. Mr. Bickel said, I believe, or I think, or That, I disremember what language he used exactly, That that was the cartridge that killed her. He never said that that was the gun that killed her. He said that that was the cartridge that killed her. Mr. Marple picked up the gun, and I think that he put the cartridge in his pocket, and he threw the gun upon a box, that I think they had flowers in, and it lay there until the next evening until his arrest. At least I saw it there after I went up there." This same witness states that a man sleeping behind where the dead woman lay could get upon his knees and reach over her and reach the muzzle of the gun in the rack. George D. Marple testifies that he on the night of the murder saw Bickle at Marple's store; that Bickle wanted somebody to come up, that somebody had killed his wife; that witness, Cutlip, Robinson and Browning went up; that Bickle said that somebody had shot his wife with their gun, said he was in bed, he was sleeping behind; that the gun was pitched in the yard. He accused his mother of doing the shoot-

ing; he was using lamenting words something about his wife being killed and in answer to a question what Bickle said as they went from the store to his house about how his wife came to her death witness says "He said that old woman had killed his wife and he would burn her before morning." That Bickle drew a chair on his mother and didn't hit her; said he supposed he prevented it. "I caught the chair as he made a draw to throw it at her;" that Bickle said the gun was in the rack right over the right of the head of the bed when they went to bed; that Bickle showed him the gun something like fifteen or twenty minutes after they got to the house and after they had looked at his wife; that witness had picked the gun up and laid it upon a flower box; that Bickle took a cartridge out of the gun and said that was what killed her. "Examine the gun here handed you and state whether or not that's the gun Chris Bickle said killed his wife, also look at this cartridge and state whether it is the cartridge?" "I took the gun up and raised this up and Chris reached over and took the cartridge out and when he pulled it out he handed it to me and said 'that's what killed my woman'." Witness identified the gun and cartridge, having marked the cartridge. He states that when he found the gun in the yard "The gun looked like it had been pitched from the door and struck on the muzzle, he could see where it had slipped down the hill with the stock of the gun next to the door." Witness states that the gun rack was near six feet above the floor and six or eight or ten inches above the bedstead on which the dead woman lay; that the bedsted was four or six or five feet high. He further says that a person could have raised up in the bed from the position occupied in the bed by Bickle and get the gun out of the rack. Prisoner himself testified that the ceiling was just seven feet high and that the rack was "right at six or six and a half from the floor. I have a girl at home that is not so tall as either of the ones here, and I have saw her take the gun out of the rack and I have saw her put it back." The defendant testifies that after they had retired the baby had got still and the dogs flew out and barked and he raised upon his elbow and hissed them as loud as he could; and that his wife said "Hush, don't do that, babe is going to sleep. That was the last words, men, I ever heard my wife speak." He was then asked "What woke you?" In answer to which question he gave the following

account: "I can tell you as near as I can about that. It appeared to me after I was fairly aroused, that some noise aroused me, or partly aroused me, but to say that I heard the report of the gun, I never could realize enough to state that at all, but it was this baby crying there that roused me and if I had not found out what I did, I would have never known the crack of the gun there. This baby aroused me, and I caught its mother by the arm that way, and shook her and said, Ma. I often called her "Ma," as much as anything else. I caught her by the shoulder and said, Ma, Ma, loud like, and called, I don't know how many times, louder. I pulled her back and gave her a shake, and she didn't answer, and I called pretty loud to Della and said, Your mother is dead in the bed, or she is so bad she cannot speak. I can tell you again I was right in that bed, but to say that I heard a shot I cannot do it. I know I grabbed her right hand felt her pulse and it had a poultice on it, and I reached and grabbed her left hand, and pulled her a little more this way to feel this hand and feel her pulse, the arm that the babe was lying on. I knew men, very well, that I felt her pulse quivver, and I know I was in that bed, but I don't know how I got out of the bed, whether I got over her, or whether I got out at the foot of the bed, I cannot tell. I don't know. I don't pretend to try to tell you, but I don't think I was off of the bed yet when I hallowed for them to light the lamp quick, I recollect that very well. I think I was on the bed yet when they come to the bed with the light.

Q. Who came to the bed?

A. Della, and Ida, and I think Hanse and Sullivan had come into the room at that time, I am not right sure about that, but I think they had, and Della said, O, law, look there, what is that on her face, and I think she said blood, but I will not be positive she said blood. The blood was right in her eye and face, and looked like her eye was busted, and I recollect that I said then, Lord, her head is busted, and I spoke then, to give me a cloth, and Della reached me a cloth, and I just fetched it a wipe that way over her face, and Della said, Lord, she is shot, and that, men, was the first time I ever realized she was shot. For I never thought of the shot until that time, and when she said that, I recollect I run to the window, the next thought it was done at the window, if she was shot. The first

thought that struck me about her being shot, there was a couple of shots shot at me, not long before that or I suppose they was shot at me, as they fell so close to me.

Objected to.

I was going to tell why I thought somebody had shot at me and struck her.

Objection not sustained by the court.

The reason I thought it had been shot through the window, a couple of shots had been shot at me, or pretty close to me in the spring before this.

Q. Where was that?

A. Right at our house, and the man that I had accused of doing this shooting had been at our house just a short time before my wife was killed.

Q. Who was it?

A. Ike Lake. It popped in my mind, that maybe he had aimed to shoot me, and had struck my wife."

He says these shots occurred about a year before.

Now when I run to the window and saw it was not broke, as well as I recollect, whether I spoke about the shoot being shot through the wall as we run back to the wall, I could not tell you to save my life whether it was Hanse or one of the girls, but someone spoke and said that Hanse's gun was gone.

Q. Was there a place there in the wall where it could have been shot through?

A. There was just a plank wall part of the way arount, just a single wall. I thought maybe it was shot through that plank, but there was no bullet holes there.

"Q. What shape was the window in?

A. In its natural shape, not broke or raised or nothing. When they spoke about this gun being gone, I threw my face right up at the rack, and saw the gun were gone. I don't know that I said anything about it being fell down, but I know I thought it had, and I stooped down and looked under the bed, and my mother were in the room then and I recollect very well she said, Chris, look in your other room for the gun. She said that to me. By this time they had the light, and maybe I said, if anybody was here—Della had said something about somebody coming in and done it, and I said, that if anybody was here I could track them? I think I said get the lantern,

or they may have had the light, anyhow I taken the lantern, but to be positive whether Hanse went clear out along with me, I cannot state it. Hanse went out on the porch with me I know, and some of the other children come out on the porch. There was only a short piece of this porch that is laid in front of the house, and the sills is out to the other end of the house.

Q. No floor all the way?

A. Yes, only part of the way has a floor on it. I stepped off of the porch between a sill and the house wall, and I told the children not to step off any place until I could see if I could see any tracks. They spoke about the door to the dining room being open, I went right to that door with the lantern, and looked particular and could not see no tracks. As I went to step over this sill that was out there, this girl that was standing on the porch said, there lays Hanse's gun in the yard, I then threw my eye below me, and there lay Hanse's gun. I started to pick that gun up, and just thought, I will not touch it and stepped back from the gun and went in the house. I went around the end of the house tracking, after I seen this gun, and then I went back in and put my clothes on and shoes, and me and my boy went to the river to get somebody to come. I recollect we went to Ira Cutlip's and passed right by the store."

The defendant was further asked—Did you fire that shot that killed your wife?

A. I did not, men, I did not.

Q. Did you throw that gun out in the yard?

A. I did not, and had not had that gun in my hands for something near a week before, I think it was.

Q. State whether or not you had any reason to put your wife out of the way?

A. I never had no reason, men, to even mistreat my woman or even to slap her face on no account, though we would have troubles and quarrels, it never amounted to anything; we jowered a heap, and don't deny it, and I never jowered much to her, I would laugh at her, and put it off, and many a time when she would commence to jower at me, I would put her off and try to get her to laughing and talking.

Q. Something has been said here, that after you went up there that night you drew a chair on your mother

A. Yes sir, I did. I don't deny what is facts.

Q. What for?

A. She walked around there, men, through the room where my dead woman lay, and go around and put her hand on the bed where she was, where my dead woman lay, and it just appeared to me that it would burst me open to see her; and when she would talk it was just the same way. It just appeared to me that I could not stand it to see her there. I asked them to make her set down there, and not talk over my dead woman, and not put her hands on the bed, and they would not do it, and they let her get up and toddle around there and set her hands on the bed where my dead wife lay. She said something to Goerge Marple, and when he got up off of the chair, I picked it up in my left hand and intended to strike her over the head and shoulders. I don't deny anything, men, of the facts. I told them to make her set down, and I tell you men, she looked mighty bad."

Defendant claimed that he was always good to his wife except when they had their little quarrels and then he was not mean to her, and denied ever having threatened to kill her. In the examination of Dr. Vermillion the following questions and answers were excepted to, as set out in bill of exceptions No. 3.

Q. Will you take the diagram handed you and show by a mark, in what position the person who fired the shot must likely have stood at the time the shot was fired.

A. Witness indicates the position in which the person stood when the shot was fired by a "dot" on the bed of the diagram.

The position occupied by the defendant and his wife, and the position of her body and head after the shooting, as described by the witness Vermillion, as well as by the defendant and other witnesses who testified as to her position on the bed, and the range the bullet took through her head from the right eyebrow down and back to the base of the brain on the left side made it proper for the doctor to describe the probable position of the person at the time the gun was fired; indeed it seems that the assaulting party could not have occupied any other position. The doctor said that from the condition of the wound that he did not think one could have stood on the floor and fired the ball "from the range it was in."

Bill of exception No. 4 relates to the testimony of George Marple who was asked to state the exact language, as near as

he could, that Hanse Bickle used in describing what occurred immediately after he heard the shot. The witness stated that the conversation took place in a room 10 or 12 by 14 feet, in which the defendant and four or five others, naming them, were present, and that he didn't know whether the defendant was listening or not; but could have heard it; that Hanse was talking in an ordinary tone of voice; that Hanse said "he heard a gun shoot and heard Jane, in the rear end of the building raise up and ask him if that was not a gun fired and he said it was, and he heard some one pass through his room that he slept in, he slept in the third room, Mrs. Bickle was in the fourth room in the corner bed in the rear end of the building." This was admissable evidence to go to the jury and it was for them to decide whether the defendant could have heard, or did hear it.

Bill of exception No. 5 relates to the question and answer propounded to and made by J. M. Marple, after stating that he had heard them, Bickle and his wife, make threats against one another, was asked by the State "What threats have you heard Chris make against her?" And answered "Well, sir, as I told you, the fact is I have heard them talk so much, and had so little confidence in what he would say, and didn't believe a word he would say, that I don't remember what he did say." It is insisted that this was a mere private opinion of the witness improperly expressed, and was prejudicial to the rights of the defendant and to a fair and impartial trial. The question was proper to be asked; the statement was not asked for but was volunteered, by the witness, it was not admissable when made, but as the witness was afterwards examined so as to qualify himself to speak as to veracity of the defendant this evidence became competent and was properly allowed to remain in the case. But aside from this the matter is not of sufficient materiality to warrant the disturbing of a verdict proper under all the evidence, it clearly appearing that the defendant could not be prejudiced thereby.

Bill of execution No. 6 is taken to the ruling of the court in sustaining an objection to the question of the defendant who had stated that he had been in Sutton jail since the 8th of last April, "During the time you have been in jail state whether or not there have been any prisoners escaped from the jail or not?"

At the time of asking the question the defendant's counsel stated that the object of it was to show that while the defendant was confined in jail prisoners escaped from the jail and he, the defendant had an opportunity to escape and didn't do so. In Underhill on Criminal Evidence, sec. 119, page 151 it is said "But evidence to show that the accused had an opportunity to escape, or to break jail of which he did not avail himself; * * * is inadmissible." In *Johnson's Case,* 94 Ala. 35, it is held "in criminal case, the defendant cannot make evidence for himself, by proving that he refused to flee, and voluntarily surrendered to the Sheriff" and in *State* v. *Montgomery,* 53 Cal. 576, "Evidence that the defendant while confined in jail, had an opportunity to escape and declined to do so, is not admissible," and the same is held in *The People* v. *Rathburn,* 21 Wend. 509. In the preparation of their bill of exceptions defendant's counsel has inserted the evidence of P. L. Anderson, the witness for the State, in which he gives the conversation with the defendant at the jail window in which he made threats against people who would testify against him, in which conversation he said "If he was just out of there for a few days here, then they might burn him at the stake or do what they pleased with him." Defendant's counsel claimed that to have been permitted to show that the defendant had an opportunity to escape and did not do so, it would tend to refute the truth of the statement of said Anderson, that he had made threats against witnesses; that the State evidently introduced said testimony of Anderson "for the purpose of proving visciousness and depravity on the part of the defendant and his competency and inclination to commit the grave offense with which he is charged." It would seem from the evidence including that of the defendant himself, as shown in his testimony, that the State would not be under the necessity of resorting to any such evidence for such a purpose, when he admits that when his old mother—81 years of age, the woman who gave him life and nurtured him into manhood and whom even his animal instinct alone should lead him to protect and defend, came into the room, no doubt to show and express her sympathy for the family and her grief on account of the dastardly deed that had been committed, when even he himself does not claim that she was doing anything more than walking around the room where her daugh-

ter-in-law was lying dead and put her hand upon the bed, the defendant seized a chair and, using his own words said"I intended to strike her over the head and shoulders. I don't deny anything, men, of the facts. I told them to make her set down and I tell you, men, she looked mighty bad." And is it any wonder that "she looked mighty bad" when her own son at a time and on an ocasion like that should attempt to beat her brains out with a chair? If the jury desires stronger evidence of his "visciousness and depravity" and his "competency and inclination" to commit the grave offense with which he is charged I am at a loss to know how they would find it, or what amount of evidence would be required to satisfy the jury that he was the man capable of committing the unnatural and brutal crime with which he was charged.

Bill of exception No. 7 relates to the evidence of Mollie Westfall where defendant was attempting to prove the actions of Jane Bickle while at the house of the witness, some weeks after the tragedy, witness having stated that Jane came to her bed two or three times one night and was asked the question "What was the position of her hands when she came to your bed?" The evidence was clearly immaterial and properly excluded.

Bill of exception No. 8 goes to the cross examination of Mollie Westfall and shows that after all the evidence had been introduced on behalf of the State and defendant, counsel for the defendant moved to exclude from the jury all questions propounded to the witness Mollie Westfall and the answers made thereto upon cross examination by counsel for the State. No objection was made to such cross examination until after the evidence was all in. The objectionable part of it related to a little difficulty between the witness and Chris Bickle, the defendant, which took place some five, six or seven years before. While the cross examination was in violation of a rule of practice which ought to be established as shown in *Hatfield Case*, 48 W. Va., 562, syl. pt. 5, but which practice has not fully obtained in the trial courts of this State; but the matter brought out on such cross examination, while it was immaterial in the trial of the issue in this case could not have prejudiced the defendant's rights.

The defendant had a full, fair trial and this Court will not set aside a verdict rendered after such trial for an error in not

enforcing a rule of practice in the trial of the case; when it clearly appears from the whole case that the rights of the defendant could not possibly have been prejudiced or affected thereby.

The only pretense in the way of defense on the part of the defendant is that the crime was committed by his mother, "The old woman." Having made witnesses of all his children to exonerate himself and if possible to implicate his mother, he fain would have the jury believe that the "Old Woman," 81 years of age did take that gun down from the rack, climb upon the bed and take her position thereon in the very spot occupied by himself, shoot the woman, climb down from the bed without, in the least, disturbing his peaceful slumbers, throw the gun out at the door of the dining room as she noiselessly tripped back through both the other rooms to her own bed which she reached in time to call out, immediately after the firing of the gun, inquiring whether that was a shot fired. The defense is "The drowning man catching at a straw" and no straw in reach.

The judgment of the circuit court must be affirmed.

*Affirmed.*