# CHARLESTON.

## STATE v. JAMES POWERS.

Submitted September 12, 1922.   Decided September 26, 1922.

1. CRIMINAL LAW—*Change of Venue Addressed to Sound Discretion of Court; Burden Upon Accused to Show Good Cause for Change of Venue.*

   An application for change of venue in a criminal case is addressed to the sound discretion of the trial judge, and the burden is upon the prisoner to show good cause for the change. (p. 745.)

2. SAME—*Prejudice Against Accused Must be Shown to Exist at Time of Application to Support Change of Venue.*

   If the cause on which the application for change of venue is ill feeling or prejudice against the prisoner, such cause

must be shown to exist at the time the application is made, not that it existed at some distant prior date. The existence of local prejudice and ill feeling against the prisoner at a term of court held three months before the time of making an application, is not sufficient to warrant the assumption that such feeling existed at the time of application, especially where there are numerous affidavits from representative citizens that no such feeling or prejudice exists.   (p. 745.)

3.   LARCENY—*Those Aiding and Abetting Commission Punishable as Principals.*

Where two or more persons conspire and confederate together to commit larceny and each takes some part in the commission of the crime, one or more to commit the act while the others watch to prevent surprise; or station themselves at a convenient distance to favor escape, or assist in asportation or concealment of the stolen property, thus lending aid and encouragement to the one who commits the act, all are in a common cause and are constructively present at the taking, if the larceny, in fact, be committed; and all are punishable as principals.   (p. 745.)

4.   SAME—*Instrumentalities Found in Possession of Accused in Flight After Larceny Held Admissible.*

In the trial of an indictment for the larceny of an automobile, and the facts and circumstances warrant the conclusion that the persons indicted stole and drove away the car in furtherance of a common purpose and when overtaken in the asportation of the car flee from arrest, and some of them resist arrest, it is not error to admit in evidence the instrumentalities found in their possession or secreted by them in their flight, such as revolvers, flash lights, cartridges, maps, glycerine, raw cotton, gauze, and the like, with explanation of their common uses.   (p. 751.)

5.   SAME—*Possession of Stolen Car Shortly After Theft Strong Circumstance of Guilt.*

Possession of a stolen car within a short distance from and within a half hour after the theft, the car then being driven from the place of theft, is a strong circumstance tending to show that the persons found in possession are the thieves, and the jury may consider it in connection with all the other facts and circumstances in proof, although considered by itself it would not be prima facie evidence of their guilt.   (p. 751.)

6.  CRIMINAL LAW—*Charge Defining "Reasonable Doubt" Held
     Not Reversible Error.*

    Instructions attempting to define "reasonable doubt" are
    discouraged, but, as given in this case, are not cause for
    reversal.  (p. 752.)

Error to Circuit Court, Doddridge County.

James Powers was convicted of grand larceny, and he
brings error.

*Affirmed.*

*G. W. Farr* and *W. R. Brown,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. A. Blessing* and
*R. Dennis Steed,* Assistant Attorneys General, for the State.

LIVELY, JUDGE:

Defendant, James Powers, prosecutes this writ of error
from a judgment of the circuit court pronounced on the 3d
day of December, 1921, sentencing him to confinement in the
penitentiary for five years for the crime of grand larceny.
The indictment charges him and three other persons, Young,
Bertone, and Hall, with feloniously stealing and carrying
away a Ford touring car, the property of J. A. Barr and
C. A. Dowler.

The defendants, who were strangers in the town of West
Union, were first seen there together about dark on the
evening of April 22, 1921. A girl, 15 years of age, said she
saw them together that day on a west bound passenger train
which arrived at West Union about 7 P. M., two of them
having boarded the train at Clarksburg, and the other two
at Salem. Young and Powers deny having been on that
train. They both said they (Young and Powers) got to-
gether near Long Run the night before, slept in a barn, got
breakfast at a farm house, boarded a passenger train at Long
Run and left it before it reached West Union, and walked
into the town. There was evidence tending to corroborate
them in this particular. A short time before, and after dusk
they were seen by various persons in various parts of the
town, and their actions and movements were of such an
unusual character as to excite comment and suspicion, and

the chief of police was notified to be on watch for them. One of them carried a small satchel, and Powers being larger than the others and wearing spectacles, was easily identified. They were seen on the street near the garage from which the car was taken. The chief of police passed them in his car near the outskirts of the town on the road leading towards Sistersville, between 9 and 10 o'clock that night, and after going a short distance beyond them, turned his car and came back, but they had disappeared from the highway. About 10:30 he again drove over that road to ascertain their movements, and observed one of them only on or near the road at about the same point, which was about one-half mile from the garage from which the car was stolen. The car was taken between 11 o'clock and 12:30 that night. A slight drizzle of rain had begun and the night was dark. The four men in the car were seen by Dale Scott about 12:30 a short distance from the town on the road leading to Sistersville, when they stopped the car and inquired from him directions to Centreville. The roads were muddy, the night dark, and after various vicissitudes occasioned by the mud, darkness and lack of knowledge of the proper route, testified to by various witnesses to whom they gave evasive answers to pertinent questions, they reached the village of Centreville and stopped to purchase more gasoline from Underwood, when Lloyd A. Riggs approached them and said the car had been stolen at West Union, and that they could go no farther. Young denied that the car was stolen. It appears that about this time Mr. Barr, at West Union, had discovered the theft of his car and had telephoned to various persons on the roads leading from West Union to be on the outlook for it, and was talking over the telephone with Riggs at the time this car drove up to get the gasoline, and gave him the license number of the car. Hall, one of the defendants, appears to have been out of the car standing near it at the time Riggs' accosted them. The driver, Young, immediately started up his car, and they all seemed to be in a hurry to get away, so much so that they forgot to pay for the gasoline, and had proceeded a short distance when the car stopped and

91 W. Va.

one of the men in the rear of the car paid for the gasoline
out of the rear, and they immediately went forward very
swiftly.   Hall started in the opposite direction, and took to
the hills near the town.   The car proceeded a short distance
and again stuck on a hill near the residence of Wm. H. Barn-
hart, where they all abandoned it and proceeded rapidly up
the hill on foot.   Defendant was the last to leave the car,
and had in his hand the satchel, which, after proceeding a
short distance, he gave to one of the other defendants.   They
disappeared over the hill.   Immediately a hue and cry was
raised and many persons joined in the chase.   The sheriff
from West Union arrived shortly afterwards, and he and
Squire Meredith participated in the chase.   The three men,
Powers, Young and Bertone, were discovered several miles
from the place they left the car, and near the mouth of
Indian Creek, Bertone being crouched on the bank of the
stream, and Powers and Young in the act of crossing in a
boat.   They were commanded to return to the shore, and
replied that as soon as they could turn the boat they would
come back, but on the contrary went to the opposite shore
and leaving the boat ran up the bank through the brush
and on up the hill.   When Bertone was approached he drew
a revolver and threatened to shoot any one who came near
him, retreated down the stream, and was not followed at
that time.   He was afterwards captured.   Powers and
Young were promptly followed.   They separated near the
brow of the hill, one going to the right and the other to the
left.   Young was first followed by his pursuers, and cap-
tured a short distance over the hill.   Powers was afterwards
discovered ingeniously secreted in a slip or slide on the hill-
side.   He had a small steel punch in his pocket, and a loaded
revolver was found in the mud where he was concealed.
Hall was afterwards captured, and all three were taken before
Squire Meredith at Centreville.

The trail of the three men was followed from where the
car was abandoned, and in the edge of a brush pile near a
wood the satchel was found freshly covered with leaves, and
about fifteen feet from the satchel a pint bottle containing

glycerine also freshly covered with leaves, was found. On the other side of the brush pile, opposite the place where the satchel was found, a small torn Rand & McNally map of Tennessee was discovered, also freshly secreted in the leaves. The satchel contained a small roll of wire used for hanging pictures, a box of cartridges, soap, some tobacco, gauze, a small bit of raw cotton, some liniment, a bottle of sal hepatica, a railroad schedule, some old sox, a shirt, and a cork.

Defendants were jailed, and the indictment followed. At the August term of court Young confessed the theft, and was sentenced. Bertone was tried and acquitted. At the following November term of court this trial was had, resulting in the conviction of Powers. Young, (who admitted "Harry Young" was an assumed name), said he alone stole the car. He had told Powers "in a cynical way" before they came to West Union that he had a car in that town, and would ride him over to some town in Tyler county, and Powers proposed to pay for the ride, and furnish the gasoline necessary. Seeing that Powers took the proposition as in earnest, he thought he must make good, and stole the car. Powers corroborates Young. Hall and Bertone did not testify. At West Union, Powers proposed that Hall and Bertone, whom he said they met at that place, should go in the car with them, to which he assented. He said he inquired the way to Sistersville, and then took his companions out on the Sistersville road where they went into a barn to be sheltered from the rain, left them there with information that he would go back, get his car and pick them up. He testified that the others knew nothing about the car being stolen, and he gave them no information to that effect until the car stalled on the hill at Centreville when he advised them of the fact, and they all left the car and sought to avoid arrest. He claimed ownership of the grip and its contents, but denied that there was any pistol therein. Both Powers and Young refused to give any information of their movements prior to the 21st of April. They refused to tell if they had known the other defendants at any time prior thereto, both claiming that the Federal Government

was preferring charges against them, and that if they testified as to their whereabouts prior to the time they stole the car the sleuths of the Federal Government would warp their testimony and use it against them to their detriment in the threatened prosecutions. Powers testified that he had agreed to pay for being hauled in the car, and in addition to furnish the necessary gasoline.

There are many assignments of error. The principal assignments are (1) that the court refused a change of venue; (2) that the evidence was not sufficient to sustain the verdict under the indictment; the verdict finding the defendant guilty as a principal in the crime; and (3) that the instructions given were erroneous.

The motion for change of venue was supported by the affidavits of Waldo, Thompson, Ables, Mrs. Clara D. Brown,. G. W. Farr and W. R. Brown, the last two being counsel for defendant. These affidavits show that at the August term of the court upon the return of the verdict of not guilty in the Bertone trial, Smith and Markey, and other persons, were very bitter in their denunciations of the jury that had returned the verdict; and suggestions were made by them and others of the town that the people should take the law in their own hands and see that the prisoners should be punished; some going to the extent of saying that they should be lynched. Ables, who was one of the jurors, says various persons insulted him, threatened to hang him and otherwise abused him for returning the verdict, and since that time this attitude toward him has continued; that when he went to get his pay as a juror the sheriff manifested a hostile feeling toward him, and severely critcised the verdict. Brown says severe criticisms were made against him and Farr for defending the persons charged, and that the prisoners, just after being arrested in April, were taken out of jail and paraded through a large crowd of people, treated roughly by the sheriff and his deputies before the public, and their pictures taken forcibly and against their will. A newspaper published by Smith at West Union in the month of October, 1921, published an article stating that Harry

Harowitz, alias Harry Hooks, had recently been extradited to the state of New York for complicity in a $15,000 fur theft, and it had been ascertained that Bertone, who was acquitted at the August term of court, was the man who was extradited under the name of Harowitz. This published article was filed in support of the motion. These affiants all give their opinion that defendant cannot be given a fair and impartial trial because of the prejudice existing against them engendered by the causes set out. The state filed the affidavits of Wilcox, prosecuting attorney; Gregory, post office inspector; Smith, the editor; Allen, the sheriff, and thirteen other persons. Those affiants who lived in the town said there was opinion on the part of those who heard the Bertone trial, then freely and vigorously expressed, that there had been a miscarriage of justice; that the verdict was unpopular. The prosecuting attorney says he has taken special pains to ascertain if any prejudice exists against defendant, and has interviewed various persons from all parts of the county, and can find none; that generally the inhabitants do not know of the pendency of the indictments or trial. The sheriff says that while the Bertone verdict was unpopular, since that time he has heard little discussion of the case; that he has been in all parts of the county in the collection of taxes and the like, and has never heard the case mentioned except on one occasion by a juror in the Bertone case. Many of the other affiants, all of long residence in the county, say they have never heard the case mentioned, and all are of the opinion that defendant can be accorded a fair and impartial trial. The *voir dire* of the jurors called and selected is not in the record. The alleged rough treatment of the prisoners by the sheriff and his deputies occurred before the Bertone trial, and it seemed to have no ill effect on the result of that trial. The other incidents occurring immediately after the Bertone trial, relied upon, were three months before the time of this trial. The court evidently came to the conclusion that the feeling brought about by that trial and which was confined to the town of West Union had largely died out.

A change of venue is addressed to the sound discretion of the trial court, and its action will not be disturbed unless there is clear abuse of discretion. *State* v. *Sheppard*, 49 W. Va. 582. The cause for removal must exist at the time of the application. *State* v. *Greer*, 22 W. Va. 800; and the burden is on the prisoner to show it. We have carefully considered all of the affidavits, and have come to the conclusion that we cannot say that the court abused its discretion. The record does not satisfactorily disclose such prejudice against the prisoner at the time the application was made as would prevent a fair and impartial trial. There was no talk of violence toward him at that time, and little evidence of ill feeling toward him in the town.

The instructions for the state, Nos. 1 and 2, are to the effect that if the jury believe beyond a reasonable doubt, that the defendant, together with the others indicted, set out in concert with a common design and purpose to steal the car, and in pursuance of that purpose and design the car was taken by them or either of them, and found in the possession of the defendant and the others jointly indicted; and the taking was the result of the common design, and immediately after the theft the car was found in possession of Powers and the other defendants; they should find the defendant guilty, even though the defendant did not personally enter the garage and remove the car or assist in doing it; that it was not incumbent on the state to show his actual and immediate presence so as to make him an eye or ear witness to the theft, but if the jury believed beyond a reasonable doubt that they all acted in concert with common design and purpose to take the car, each one taking the part assigned to him, then the defendant should be found guilty as charged. One objection to these instructions is that the court in giving them intimated to the jury that the judge believed that a common purpose and design had been formed by the defendants to steal the car, whereas there was no evidence to show a common purpose and design. We do not so construe this instruction. It was the theory of the prosecution that such common purpose and design

had been formed and that the whole circumstances impelled that belief. The question was submitted to the jury that if they believed beyond a reasonable doubt that such design was formed, they should find, etc. We can see no indication of any expression of opinion by the judge. The evidence points strongly to a common design. Their actions, both before and after the theft, strongly point to it. It would be rather remarkable for four strangers in a town to meet casually, and one of them propose to take the others to a common destination in his car, starting from a point distant from the town and in the middle of a rainy night, without knowing which road to travel. Their efforts to escape arrest when discovered as detailed denote guilt. Why flee arrest when told they were in a stolen car, if innocent passengers? Then was the time to proclaim innocence. Their actions in the town of West Union, immediately prior to the taking, were so suspicious that the officers were warned to be on the lookout. They were apparently well acquainted with each other, and the refusal of the defendant to state whether he had known the others at any time prior to the meeting was an additional circumstance. The jury had evidence on which to base a conclusion that there was a concerted design on their part to do just exactly what was done; and we think they were justified in so finding from all the facts and circumstances.

It is further urged against these instructions that even if a common purpose and design had been formed, yet it was not shown that Powers was near the garage when the car was taken, and was not aiding or abetting the theft in any manner; nothing tending to show that he was on watch or guard or nearer to the place of the theft than one-half mile when the crime was committed; and not being indicted as an accessory before the fact could not be convicted as a principal in the second degree. It has been said: "The distinction between principals and accessories before the fact is in most cases a distinction without a difference, and often requires nice and subtle verbal refinements to express it. It is supposed to have originated at time when criminal lawyers

puzzled their wits and taxed their ingenuity to invent metaphysical shades of distinction, such for instance as that between principals and accessories at the, fact, which once existed, but is now exploded. The distinction between principals and accessories before the fact is fast following its kindred technical refinement." *State* v. *Poynier,* 36 La. Ann. 572. Some of the states have provided by statute that all parties to a felony, either before or at the fact, shall be principals; and under such statutes all parties, who at common law would be accessories before the fact to larceny, become principals, and may be convicted as such. California, Minnesota, Montana, Pennsylvania and Texas have passed such statutes. However, in this state we still recognize the distinction between accessories and principals, and an accessory to be convicted must be indicted as such. *State* v. *Roberts,* 50 W. Va. 422; *State* v. *Cremeans,* 62 W. Va. 136. It is not necessary for a person, who has entered into a common design or conspiracy to commit a crime, to be actually present at the place of commission in order that he may aid and abet the crime. It is sufficient if, in following the common design, each person performs some act in the commission thereof in furtherance of the common purpose. The doctrine is well stated in Russell on the Law of Crimes, 7th edition, page 108, as follows: "The *presence* need not. be a strict actual immediate presence, such a presence as would make him an eye-witness or ear-witness of what passes, but may be a constructive presence. So that if several persons set out together, or in small parties, upon one common design, felonious or unlawful in itself, and each takes the part assigned to him; some to commit the fact, others to watch at proper distances and stations to prevent surprise, or to favour, if need be, the escape of those more immediately engaged; they are all, provided the fact be committed, in the eye of the law present at it; for it was made a common cause with them; each man operated in his station at one and the same instant, towards the same common end, and the part each man took tended to give countenance, encouragement and protection to the whole

gang, and to insure the success of their common enterprise."
It is more tersely stated in 1st A. & E. Encyc. of Law (2d
ed.) page 259, as follows: "A principle that, where several
persons are engaged in a common criminal design, with a
distribution of the parts, and each takes the part assigned
to him, all are equally guilty, is often applied to distinguish
principal from accessory." It makes no difference how
widely the confederates are separated, if they are engaged
in the common plan for the execution of the crime and all
take and perform their part in its furtherance. Under such
conditions they are principals. "Actual presence is not
necessary if there is direct connection between the actor and
a crime." 1st Wharton's Criminal Law, sec. 218. The case
of *Regina* v. *Kelly and McCarthy,* in 2 C. & K. (Eng. Nisi
Prius Reports) page 379, illustrates the application of the
doctrine where two persons were indicted for stealing oats.
Kelly was hired by the owner to haul the oats from a vessel
to his (the owner's) warehouse, and McCarthy was employed
by the same owner to load the oats from the warehouse into
trams on which they were carried, the trams belonging to
Kelly. Kelly and McCarthy were seen to confer together,
and the latter said "It is all right," and shortly afterwards
McCarthy was seen emptying the oats out of a sack on the
tram, in the absence of Kelly, and placed the same at a con-
venient place where afterwards Kelly, who was not present
at the theft, returned and took the stolen oats from where
McCarthy had placed them, and drove them away. It was
held that both were principals in the larceny and that Kelly
was not a receiver; that it was all one transmission, both
concurring in it, and that both had been present at some
parts of the transaction. In the case of *State* v. *Heyward,*
10 Am. Dec. 604, several persons, the prisoner being one of
the number, conspired together and committed an assault
on John Peoples, who was in his wagon on the highway; a
short time after the assault had been committed two of the
conspirators again approached Peoples and robbed him of
his money; and it was held that where it had been shown
that the defendant had associated with a number of others

for the. commission of the crime, although he was absent when the crime was committed, he was deemed to be constructively present, and was, therefore, guilty. In the case of *Commonwealth* v. *Barry,* 125 Mass. 390, the defendant entered into a preconcerted plan with a confederate to steal a trunk and its contents, which was in the baggage room at a railroad station. The confederate went to the baggage room where he had a valise checked, and under the pretense that he wanted to put something in his valise, obtained admittance, and while the attention of the baggage master was drawn away he changed checks, putting his on the trunk, which was to be sent to New York, and placed the trunk check on his valise. The defendant then boarded the same train as that carrying the trunk, and received it in New York, and rifled its contents. Each confederate acted his part in the larceny of the trunk, although the defendant, who was under trial, had not participated in the incipient taking. He had taken part in the asportation and was held to be guilty of the larceny.

The doctrine is further illustrated in. *Commonwealth* v. *Knapp,* 26 Mass. 125. *Commonwealth* v. *Hollister,* 25 L. R. A. 349, where it was held: ''Active participation in planning and feloniously taking money followed by actual taking by part of the confederates in pursuance of the plan will warrant a conviction of larceny, although the accused was not present when the crime was actually committed.'' See 1st A. & E. Encyc. 259: ''Actors in Common Criminal Design,'' and cases cited.

Applying this doctrine as a test to the first instruction offered by the state, we find it sufficient. If the jury believed beyond a reasonable doubt that the defendant and the other persons jointly indicted with him entered into a common purpose and design to steal the Ford car, and in pursuance of that design one or more of them actually did the stealing while the defendant or the others waited at a convenient distance where they entered the car and assisted in its asportation, then the defendant was guilty as a principal in the second degree and punishable under the indictment as such.

Moreover, taking the statement of Young. as true that he alone entered the garage and :took the car to the place where the others were waiting for him, may it not be said that their presence within that distance would be sufficient to .aid and encourage him in the commission of the crime? One· half mile is not far when it is traversed by an automobile with reasonable speed, say at the rate of 15 miles an hour, and it can be reasonably presumed that this speed was made by Young, if he took the car. His confederates would be only two minutes away from the actual place of taking. His confederates were .armed, and their near presence with dangerous offensive weapons in their possession would most likely give him a feeling of encouragement and security from immediate pursuit. Moreover, it must be remembered that Powers himself testified that he was willing to furnish the gasoline by which the car was to be driven. He had agreed to furnish the power by which the stolen property could be taken away. Under this evidence the jury might well come to the conclusion that Powers not only entered into the conspiracy to steal but actually participated in the theft, although he may not have been present at the taking from the garage.

We have been discussing the case on the theory that Young alone took the car from the garage. Evidently the jury did not believe his testimony, for they practically found that the defendant was present at. the time it was taken out of the garage; for instruction No. 11, given for the defendant, told them that under the law and. indictment before the defendant could be convicted the state must prove beyond a reasonable doubt that the car was stolen, and that James Powers was at the garage, stood by and aided Young in getting possession and control of the same and of stealing it, and if they believed from the evidence that Harry Young alone stole the car then they should find Powers not guilty. When Powers was captured in his hiding place in the slide under the brow of the hill a metal punch (not well described) was found on his person, and one of the witnesses testified that this punch could have been used as an instrument by

which the staple was drawn from the door of the garage. While this evidence was of little value it may have indicated to the satisfaction of the jury, in conjunction with the other evidence, that Powers was actually present at the taking.

Assignments of error 3 to 16 inclusive, and Nos. 20 and 21, relate to introduction of evidence. The assignments are merely stated in the brief and no authorities are cited to sustain the objections, and no argument based thereon. However, assignment No. 9 relates to the evidence of Pierpont, who was asked if he knew anything about a grip that was found. He was one of the party who went in search of the grip after all the prisoners had been captured, and detailed when and where the grip was found, identified it as the one in evidence, stated that the glycerine had been found before he reached those who had found it, and said it was in a pint bottle. He was asked for what purposes glycerine was used, and answered it was "used for blowing up safes, shooting oil wells and lots of things." An objection to the last answer was overruled. It is argued that such evidence was irrelevant, and had no bearing on the issue and was calculated to prejudice the minds of the jury, citing *Deitz* v. *Providence Ins. Co.*, 33 W. Va. 526. We can see no objection to an explanation of the properties and uses of glycerine. It is a dangerous preparation, the uses of which are not generally known. The uses to which the revolvers and cartridges could be put, would have been superfluous, as their uses are commonly known. We do not agree that the possession of these dangerous instrumentalities, taking into consideration all the facts, was not pertinent to the issue of common design and purpose. The same may be said of the objections to the introduction of the revolvers, and the contents of the grip, as set out in other assignments of error. It will be remembered that Powers seemed solicitous of the grip when the car was abandoned, and carried it with him until it was taken by one of the others. His explanation is that he did not want Young to leave without his property, and innocently picked it up when he discovered it had been left by him in his precipitate flight.

State's instruction No. 3 tells the jury that the possession of recently stolen property is a circumstance tending to show that the possessor is the thief and may be considered in connection with all other attending circumstances and facts. It is well settled that while possession of recently stolen goods is of *itself* not even prima facie evidence of guilt, yet it may be considered with other facts and circumstances as a circumstance bearing upon the guilt of the accused. *State* v. *Reece,* 27 W. Va. 375; *State* v. *Heaton,* 23 W. Va. 773.

State's instruction No. 4 is alleged to be bad under authority of *State* v. *McCausland,* 82 W. Va. 525; *State* v. *Ringer,* 84 W. Va. 546; and *State* v. *Long,* 88 W. Va. 669. The instruction here complained of is, ''The Court instructs the jury that they are the sole judges of the weight of testimony of any witness who has testified before them in this case, and in ascertaining such weight, they have a right to take into consideration the credibility of such witness, as disclosed from his evidence, his manner of testifying and demeanor upon the witness stand, and his apparent interest, if any, in the result of this case. And if the jury believe that any witness has testified falsely as to any material fact, they have the right to disregard all the testimony of such witness so testifying falsely, or give to his testimony, or any part thereof, such weight only as the same in their opinion may be entitled to.'' This is in the language used in the case of *State* v. *Staley,* 45 W. Va. 793, which was approved in the Ringer case cited by appellant's counsel.

State's instruction No. 5, attempting to define reasonable· doubt, is urged as erroneous. It is the same as that approved in *State* v. *Bickel,* 53 W. Va. 597. On the propriety· of giving instructions defining reasonable doubt, it is not necessary to repeat what was said in *State* v. *Worley,* 82· W. Va. 350. Usually such instructions do not add to nor detract from the common interpretation of the phrase. The ordinary juror is capable of determining the meaning of the phrase ''reasonable doubt,'' without interpretation.

Usually such instructions, while discouraged, are not cause for reversal.

State's instruction No. 6 is as follows: "The Court instructs the jury that if they believe from the evidence in this case beyond a reasonable doubt that the defendant James Powers and Harry Young, or that James Powers, Harry Young and the other two men indicted jointly with them, set out in concert, whether together or apart, upon the common design and purpose to steal the Ford Touring Car described in the indictment in this case, each taking the part assigned to him, some to take and steal the said car, and others of them to watch at proper distance, to prevent a surprise, or to favor the escape of the immediate actor or actors taking the car; and that pursuant to said common design and purpose, said James Powers acted the part assigned to him, and said car was taken from the J. A. Barr garage, and was on the 23rd day of April, 1921, found in the possession of the said Harry Young, James Powers and the other two men jointly indicted with them, then the jury should find the defendant James Powers guilty as charged in the indictment." This instruction more clearly states the doctrine embodied in State's instructions 1 and 2, and what we have said hereinbefore in considering them applies with equal force to this one.

Defendant's instructions, 6, 10, 15, 19, 20 and 21 are to the effect that in order to convict, the state must show beyond reasonable doubt that Powers was actually present at the garage when the car was taken. What we have said in consideration of State's instructions 1 and 2 disposes of these instructions, and sustains their refusal.

Defendant's instructions No. 8 was refused. The instruction alleged the ownership of the car to be in J .A. Barr and C. A. Dowler; the evidence disclosed that it was owned by the firm of Barr & Dowler, and the instruction told the jury if they found the ownership of the car was in Barr & Dowler, they should find defendant not guilty. Any general or special ownership of J. A. Barr and C. A. Dowler in the car would be sufficient under the indictment, and there was

no error in the refusal of the instruction. Sec. 7, Chap. 58 Code. *State* v. *Heaton,* 23 W. Va. 773.

The substance of defendant's instruction No. 9 was given in his instructions Nos. 22 and 23, and for that reason properly refused. Instructions must not be repeated.

The whole theory of the defense was given in defendant's instruction No. 11, the substance of which has hereinbefore been given; and in Nos. 17 and 22, which are as follows:

"The Court instructs the jury that you are trying James Powers upon an indictment charging him, jointly with Harry Young, Michael Bertone and John Hall, with stealing the Ford touring car from the garage of James Barr, in the town of West Union, on the ——— day of April, 1921, as described in the indictment, and the jury are instructed that the acts and declarations of Harry Young, Michael Bertone and John Hall cannot be by you considered against the defendant, James Powers, on this trial, unless the State proves beyond all reasonable doubt that said defendant Powers was in a combination and agreement with Harry Young, or with Harry Young and the other two persons jointly with Powers and Young to steal the car in question, and if you believe from the evidence that the State has failed to prove such combination or agreement, beyond all reasonable doubt, you will exclude from your consideration all of the acts, conduct, conversations, behavior, and evidence introduced by the State, as to anything said or done by either Young, Bertone or Hall, and give it no consideration whatever in coming to your decision as to the defendant James Powers."

"The Court instructs the jury that if you believe from the evidence in this case beyond all reasonable doubt, that Harry Young, one of the defendants in this case, on the evening and night of April 22nd, 1921, represented to the defendant, James Powers, who is jointly indicted with this defendant, that he was the owner of a certain automobile, and that he then and there agreed to take the said defendant and the other two defendants to the town of Sistersville, and that Harry Young went to the Barr garage alone and with-

out the knowledge of the said James Powers and stole therefrom the automobile car described in the indictment and drove said car from said garage about one-third or one-half of a mile down Middle Island creek, in Doddridge county, where the said James Powers and the other two defendants got into said car, and that said Harry Young drove them in said car to the vicinity of Centreville, in Tyler county, West Virginia, where the said defendants were arrested, and that then and not until then did the said defendant, Harry Young, inform the said James Powers that said car was stolen, and that the said James Powers did not have knowledge that it was a stolen car until so informed by Young, then the jury should acquit the defendant on the charge laid in this indictment.''

The jury evidently disbelieved the evidence given by Young and Powers. We are asked to set aside the verdict, and judgment on the ground that the evidence is not sufficient. We think the evidence is sufficient to warrant the verdict and judgment.

Defendant was ably represented and his defense was well and forcibly presented; and finding no reversible error, the lower court is affirmed.

<em>Affirmed.</em>