309 S.E.2d 600

**STATE of West Virginia**

v.

**Nelson Clark ASHCRAFT.**

No. 15822.

Supreme Court of Appeals of
West Virginia.

Nov. 10, 1983.

Jones, Williams, West & Jones, John S. Kaull and Jerald E. Jones, Clarksburg, for appellant.

Chauncey H. Browning, Atty. Gen. and S. Clark Woodroe, Asst. Atty. Gen., Charleston, for appellee.

McGRAW, Chief Justice:

Nelson Clark Ashcraft appeals from a final order of the Circuit Court of Ritchie County entered August 17, 1981, which confirmed his conviction for first degree murder, denied his motion for a new trial, and sentenced him to life in the penitentiary, subject to the jury's recommendation of mercy. The appellant makes eight assignments of error: 1) the trial court erred in refusing to grant a portion of the appellant's motion for a bill of particulars; 2) the court erred in refusing the appellant's request for individual voir dire of the jury panel; 3) the court erred in refusing to permit cross-examination of a prosecution witness concerning admissions made by a codefendant; 4) the court erred in permitting the State to introduce into evidence a .22 caliber rifle, and in permitting the

State to exhibit and demostrate a Colt AR–15 rifle before the jury; 5) the court erred in refusing to give certain of the appellant's instructions; 6) the court erred in failing to instruct the jury on involuntary manslaughter; 7) the court erred in giving a "common intent" instruction; and 8) a witness for the prosecution testified falsely. We find merit in the appellant's second assignment of error, and, therefore, reverse his conviction. We will briefly discuss the appellant's other assignments of error, as they involve issues which could reoccur upon retrial.

The following facts were adduced from testimony at trial. In early June, 1980, Austin Wayne Ledsome met a man known as Robert Lilly[1] at Kyle's Tavern in the town of Elizabeth in Wirt County. Both Ledsome and Lilly were unemployed. They became friends and agreed to work together collecting junk and hauling it to Parkersburg to sell. They engaged in this business pursuit for the next two or three days.

Ledsome spent Friday night, June 6, 1980, at Lilly's house off Oxbow Road in Ritchie County. The next morning, after a breakfast of groundhog, Lilly and Ledsome discussed hauling a load of junk to Parkersburg, but then decided to go fishing instead. After retrieving their fishing poles and placing them in Lilly's truck, they drove out of the hollow. On the way, they met a man called "Red" at a cabin not far down the road from Lilly's house. They stopped and talked for awhile, and accepted Red's invitation to drink a vodka and grape juice mixture, which was served in a gallon milk jug. When all of the liquor was consumed, they drove to Elizabeth to purchase some more. They then returned to the Oxbow Road area, where they found a party in progress at a neighbor's house.

Shortly thereafter, the appellant and Denver Ash arrived. The appellant and Ash were drinking and appeared inebriated. Ash was vomiting. The appellant fell down and was helped to his feet by Ledsome. The appellant and Ash stayed at the party only a short while, and then drove off in the appellant's truck. Approximately five minutes later, Lilly and Ledsome left the party to take Red back to his cabin.

After dropping Red at his cabin, Lilly and Ledsome renewed their intentions to go fishing. But first, they decided to drive to Smitty's Tavern in McFarlan to purchase some beer to drink while they were fishing. When they arrived at the tavern, Lilly and Ledsome found a group of people outside in the parking lot underneath a tree, talking and drinking beer. The group included the appellant, Ash, and a young woman named Glenda Roush.

Lilly called Ms. Roush over to his truck and offered her a drink of the vodka and grape juice mixture, which by this time had been transferred to a Boone's Farm Tickle Pink wine bottle. She took a drink and then went inside the tavern. Lilly and Ledsome exited the truck and approached the appellant and Ash.

Lilly, Ash, and the appellant spoke cordially for a few moments, until the appellant accused Lilly of putting acid in a spring. Lilly denied this accusation and told the appellant he "didn't want no trouble." Lilly sent Ledsome into the tavern to buy some beer. Ash then accused Lilly of "talking around town about me." Lilly replied that "you guys have got a big mouth and nothing to back it up with."

While inside the tavern purchasing the beer, Ledsome heard shots. He ran to the door to see the appellant shooting at Lilly with a .22 caliber pistol. Lilly was holding his leg and said, "A man who shoots me in the back is a dirty son-of-a-bitch." When the gun ran out of ammunition, Lilly twisted it out of the appellant's hands, threw him to the ground, and beat him about the head with the gun. When Ash attempted to assist the appellant, Lilly struck him and knocked him out. Ms. Roush, who by this time was outside the tavern, took the gun from Lilly, but Lilly grabbed it back. Lilly and Ledsome then returned to their truck to leave. As Lilly was starting the truck, the appellant got up off the ground and

1. Lilly's true name was later discovered to be Robert Andrew Williams.

said, "if you come up on the hill tonight, you are a dead man."

Lilly and Ledsome returned to Lilly's house seeking ammunition for the appellant's pistol. Lilly's girl friend, Candace Rohey, was home when they arrived. Lilly appeared angry. He told Ms. Rohey that the appellant had shot him, and removed his pants to show her a wound on his right buttock. Lilly then rummaged through the house and found at least one shell for the pistol, which he placed in the gun, and then shot into a china cabinet. Lilly told Ms. Rohey that he "was going to go get [the appellant]," and that he was "tired of [the appellant] trying to run me off this hill." After Lilly and Ledsome left in the truck, Ms. Rohey telephoned Glenn Johnson, who lived down the hill from both the appellant and Lilly, and told him "to get [the appellant] out of there because [Lilly] was coming to kill him."

Lilly and Ledsome continued their search for shells for the appellant's pistol. They drove to Ernie's Quaker State on Route 47, and pulled into the parking lot. Just as Ledsome was starting to get out of the truck, the appellant and Ash arrived. Upon seeing them, Lilly pulled out the unloaded pistol, pointed it at the appellant, and snapped the trigger several times. The appellant and Ash backed their truck out of the parking lot and left the station. Ash was driving. Ledsome then entered the gas station to buy shells for the pistol, but none were available.

As Lilly and Ledsome were driving down Route 47, they came upon the appellant and Ash driving slowly in front of them. Ash began weaving the truck from one lane to the other to prevent Lilly and Ledsome from passing. Lilly told Ledsome to "hang on," put the accelerator to the floor, and rammed the truck containing the appellant and Ash in the rear end. The collision turned the appellant's truck around in the road, and slid it sideways into the gravel. Ash gained control of the truck and started up Oxbow Road, but then became stuck in the mud.

Lilly's truck was damaged by the collision, and he and Ledsome pulled over to the side of the road. Seeing the appellant and Ash stuck in the mud, Lilly got out of his truck and ran up the road after them. Before he could catch them, the appellant and Ash got their truck out of the mud and drove off. Lilly returned to his truck, where Ledsome was holding up the damaged hood to the vehicle. Lilly told Ledsome to throw the hood over the hill, which Ledsome did. Lilly started the truck, with some difficulty, and he and Ledsome headed towards McCulley's store to look for shells for the pistol.

On the way to the store, Lilly had to stop to adjust the fan on his truck to stop it from hitting the radiator. Once at McCulley's, Lilly sent Ledsome inside to see if they had any shells, while he put some water in the radiator, which had been damaged in the collision. Ledsome, knowing that Lilly was angry, told the clerk at the store that "if you do got any shells, do not sell them to Bob Lilly because someone might get hurt."

Lilly next drove to the house of a friend, whom he thought might have some .22 shells. Lilly went inside while Ledsome retrieved some water to put in the radiator. Lilly returned with a box of .22 hollow point shells. He loaded the pistol and shot a round into a tree. He then reloaded the gun, and he and Ledsome left in the truck.

In the meantime, the appellant and Ash were seen back at Smitty's Tavern. The appellant was carrying an automatic rifle, similar to a military firearm. When asked by a friend what he was going to do with the rifle, the appellant replied, "I am going to shoot them goddamn motherfuckin' sons-of-bitches." The appellant then went to the door of the tavern.

At this time, Glenda Roush was across the street from the tavern in the parking lot of Mcfarlan's Market talking with some friends. She saw the appellant leave the front steps of the tavern carrying a rifle, then walk across the road and get into his truck, where Ash was waiting. One of Ms. Roush's girl friends joked with the appellant that it was her birthday, and that "he ought to get rid of that ole gun and we could all have a party." The appellant

placed the rifle behind the seat of the truck and put an ammunition clip in the glove box. The appellant was now in "a somewhat better mood," and it was agreed that the appellant, Ash, and Ms. Roush would go to Ash's house to have a drink and fix something to eat. The three headed down Route 47 in the appellant's truck towards Oxbow Road.

When the three passed the Quaker State service station, they saw Lilly's truck sitting outside. Someone commented, "There is your buddy," but Ash, who was driving, did not stop. The appellant, Ash, and Ms. Roush continued driving on Route 47. They turned onto Oxbow Road and then up the hill next to Glen Johnson's cabin on the private road leading to Lilly's cabin, where they stopped, blocking the road.

Almost immediately, Lilly and Ledsome pulled in behind the appellant's truck. Ledsome testified that the engine in Lilly's truck died when they pulled into the road. Ms. Roush testified that Lilly rammed his truck into the tailgate of the appellant's truck. The appellant jumped out of his truck with the automatic rifle, and Lilly, using the truck door as a shield, got out of his truck holding the pistol. Who began shooting first is in dispute. Ledsome testified that the appellant started the shooting. A witness inside the Glenn Johnson house testified that the first shots fired had the sound of a high-powered rifle, not a smaller .22 caliber pistol. However, another witness, who was at another house down the road, testified that the smaller gunshots started first. Ms. Roush testified that "everybody started shootin'."

Several of the appellant's shots had broken the windshield of Lilly's truck, and there was much glass and debris falling about. Ledsome told the appellant to push in the clutch, in order to roll the truck down the hill. Lilly did so, but was unable to see where the truck was going, and it rolled into a ditch by the side of the road.

The appellant and Lilly continued firing at each other. At one point Ash was wounded in the arm. He managed to slip away to Mr. Johnson's house. Later, Ms. Roush also managed to get away to the Johnson house. By this time Lilly had emptied the .22 pistol. He gave it to Ledsome, who was still in the truck, telling him that "if you don't load this gun, we are both dead." Ledsome opened the cylinder and started to load the pistol, when a shot came through the windshield spraying glass and metal which struck Ledsome in the side of the head, causing him to spill the box of shells. Ledsome threw the unloaded pistol back to Lilly.

About this time, the appellant ceased firing. Lilly exited the truck and attempted to retreat down the hill. As Lilly was walking down the road, Ledsome heard the appellant say, "I've got another clip." Ledsome heard the appellant insert the clip into his rifle, and then a single shot was fired. Lilly fell to the ground clutching his leg. The appellant came down the road past Lilly's truck, stood over Lilly, pointed his rifle at him, and told him to "give me my gun." Lilly responded by pointing the unloaded pistol at the appellant and snapping the trigger.

Meanwhile, Ledsome, who by this time was half in and half out of the passenger door of Lilly's truck, saw Ash coming down the hill carrying what appeared to be a .22 caliber bolt-action rifle. Ash passed Lilly's truck and approached the appellant, who was twisting the pistol out of Lilly's hand and placing it in his back pocket. Before the appellant got the gun away from Lilly, Ash said to "shoot him first," and started working the bolt on his rifle. The appellant moved to the side. Ash stood over Lilly, pointed his rifle at Lilly's head, and fired a shot. After the shot, Ledsome saw Lilly quivering in a manner as if the "life is going out of them." Ledsome took off running down the hill. The appellant fired several shots in his direction, but did not hit him.

The medical examiner gave as Lilly's cause of death a bullet wound in the center of the forehead. There were also bullet wounds to the left leg and the left foot. The fatal head wound was made by a gun whose barrel was six to eight inches from Lilly's face. There was some indication that the fatal wound was made by high-

powered copper-jacketed ammunition, perhaps fired by the appellant's automatic rifle, and not by .22 caliber rimfire ammunition.

## I.

■ In his first assignment of error, the appellant contends that the circuit court erred by denying a portion of his motion for a bill of particulars. The information sought by the appellant would have required the State to specify whether the appellant would be prosecuted as a principal in the first or second degree, or in the words of defense counsel, "whether the prosecutor intended to prove that Ashcraft was the trigger man or an aider and abettor." [2] In refusing to require the State to divulge the requested information, the trial court relied upon *State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980). In *Petry*, this Court abolished the technical distinction between principals in the first and second degree insofar as that distinction must be observed in drafting an indictment, and held that "a general indictment as a principal in the first degree shall be sufficient to sustain a conviction as an aider and abettor or as an accessory before the fact." Syllabus Point 1, in part, *State v. Petry, supra.* Prior to *Petry* our law provided that a defendant whom the evidence showed to be a principal in the second degree could not be convicted upon an indictment charging him solely as a principal in the first degree. *See State v. Bennett*, 157 W.Va. 702, 203 S.E.2d 699 (1974). In *Petry* we recognized that the common law distinction between principals in the first and second degree served no meaningful purpose to defen-

dants,[3] and had become an anachronistic technicality which allowed the guilty to go free.

■ A criminal defendant is constitutionally entitled to be fully and plainly informed of the charges against him. W.Va. Const. art. III, § 14. Accordingly, we have developed liberalized rules of criminal discovery to permit defendants to learn the facts and details of the State's case against them. *See, e.g., State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980); *State ex rel. Whitman v. Fox*, 160 W.Va. 633, 236 S.E.2d 565 (1977); *State v. Cowan*, 156 W.Va. 827, 197 S.E.2d 641 (1973); *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973), *modified, in part, State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982). *See also* W.Va.R.Crim.P. 16; W.Va.Code §§ 62-1B-1, -2 (1977 Replacement Vol.). Nevertheless, with certain exceptions, criminal discovery is normally within the discretion of the trial court.[4] *State v. Dudick*, 158 W.Va. 629, 213 S.E.2d 458 (1975); *State v. Cowan, supra.*

■ It does not appear that the appellant in this case can legitimately claim prejudicial surprise as a result of nondisclosure of evidence by the State. Indeed, it appears from the record that the prosecutor employed an "open-file policy" with defense counsel. Rather, it appears that the appellant, through the discovery process, attempted to force the prosecution to elect one of two possible factual theories surrounding the degree of involvement of the appellant in Lilly's death. Given the conflicting nature of the evidence on this point, the prosecutor declined the appellant's request. As a general rule, the resolution of

---

2. The specific information requested by the appellant which the court refused to require the State to divulge was: "1) The specific act or acts of the defendant which the State contends constitute the offense of murder as alleged in the indictment whether such acts be as a principle in the first or second degree; 2) What other persons and what act or acts of such persons other than this defendant does the State contend constitute any aiding or abetting of the defendant in commission of the offense alleged in the indictment; 3) The specific act or acts of the defendant which the State will rely upon to prove (a) pre-meditation by the defendant, (b) malice, (c) willfulness."

3. W.Va.Code § 61-11-6 (1977 Replacement Vol.) provides that "every principal in the second degree ... shall be punishable as if he were the principal in the first degree ...."

4. The exceptions include the duty of the prosecution to divulge any matter which is obviously exculpatory in nature, or which may be relevant and favorable to the defendant, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *State v. Cowan, supra*, and the right of the defense to inspect notes used by a prosecution witness to refresh recollection. *See State v. Dudick, supra.*

factual disputes in a criminal trial is a function of the jury, not of the prosecutor. Accordingly, we do not believe the trial court abused its discretion in denying this portion of the appellant's motion for a bill of particulars. To hold otherwise would be to perpetuate the meaningless distinctions we sought to abolish in *State v. Petry, supra.*

## II.

The appellant contends that the lower court erred in refusing defense counsel's request for individual voir dire of the jury panel members. Prior to trial defense counsel submitted a written request to conduct individual voir dire of the jury panel. This request was made again at trial prior to questioning of the prospective jurors. The trial court denied the request, directing counsel to question the jury panel collectively. The court did state, however, that individual voir dire would be permitted if, in the court's opinion, it appeared necessary.

Questioning by defense counsel revealed a number of prospective jurors with possible prejudice or bias. Four prospective jurors had family members employed by law enforcement agencies. Four prospective jurors were acquainted with the prosecuting attorney. One of these jurors attended the same church as the prosecutor. Another was a neighbor of the prosecutor. The prosecutor was married to a cousin of a third juror. The fourth was a friend of the prosecutor—they hunted together and the prosecutor had performed some legal work for this juror. Seven members of the jury panel had read newspaper articles concerning the previous trial of the appellant's codefendant, which had resulted in the codefendant's conviction for murder. One prospective juror's grandmother may have served on the grand jury that returned the indictment charging the appellant with murder. Another prospective juror was the neighbor of defense witness Glenda Roush. Another was a neighbor of Trooper Proctor, a witness for the prosecution. At least one prospective juror was a neighbor of Trooper Frum, who had helped the juror with a problem. Trooper Frum had also returned a stolen toolbox to another prospective juror.

After eliciting the preceding information from the jury panel, defense counsel renewed his request to conduct individual voir dire of the jury panel. This request was denied by the trial court. The appellant contends that the refusal of the trial court to permit individual voir dire deprived him of his right to trial by an impartial and objective jury. We agree.

It is a fundamental tenet of due process, guaranteed by the sixth and fourteenth amendments to the United States Constitution and by article III, section 14 of the West Virginia Constitution, that a criminal defendant is entitled to trial by an impartial and objective jury. Thus, we have long held that a criminal defendant is entitled to insist upon a jury "composed of persons who have no interest in the case, have neither formed nor expressed any opinion, who are free from bias or prejudice, and stand indifferent in the case." *State v. McMillion*, 104 W.Va. 1, 8, 138 S.E. 732, 735 (1927).

The traditional means for vindicating this right is examination of prospective jurors on their voir dire, *i.e.* on their oath "to speak the truth." 47 Am.Jur.2d, *Jury*, § 196 (1969). *See also Black's Law Dictionary* at 1412 (5th ed. 1979). Voir dire examination is recognized both in our statutory law, *see* W.Va.Code § 56–6–12 (1966),[5] and in our rules of criminal proce-

---

5. W.Va.Code § 56–6–12 provides:

Either party in any action or suit may; and the court shall on motion of such party, examine on oath any person who is called as a juror therein, to know whether he is a qualified juror, or is related to either party, or has any interest in the cause, or is sensible of any bias or prejudice therein; and the party objecting to the juror may introduce any other competent evidence in support of the objection; and if it shall appear to the court that such person is not a qualified juror or does not stand indifferent in the cause, another shall be called and placed in his stead for the trial of that cause. And in every case, unless it be otherwise specially provided by law, the plaintiff and defendant may each challenge four jurors peremptorily.

dure, *see* W.Va.R.Crim.P. 24(a).[6] It "is designed to allow litigants to be informed of all relevant and material matters that might bear on possible disqualification of a juror and is essential to a fair and intelligent exercise of the right to challenge either for cause or peremptorily." *West Virginia Human Rights Comm'n v. Tenpin Lounge, Inc.*, 158 W.Va. 349, 211 S.E.2d 349, 353 (1975).

■ Pursuant to W.Va.Code § 56–6–12, the examination of prospective jurors by the trial court is a matter of right. *See State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978); *Carpenter v. Hyman*, 67 W.Va. 4, 66 S.E. 1078 (1910). The court, in its discretion, may permit counsel for either party to conduct voir dire. *See Thorton v. CAMC*, 172 W.Va. 360, 305 S.E.2d 316 (1983). The trial court may also properly limit the extent of the voir dire examination of prospective jurors to inquiries related to their qualification. *State v. Pratt, supra; State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974); *Henthorn v. Long*, 146 W.Va. 636, 122 S.E.2d 186 (1961); *Carpenter v. Hyman, supra.* The trial court's exercise of discretion in determining the extent of inquiry on voir dire is not normally subject to review on appeal. However, the court's discretion is limited by the requirements of due process, and may be reviewed in a case of abuse. *See United States v. Magana-Arevalo*, 639 F.2d 226 (5th Cir.1981). *See also State v. Pratt, supra; State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944).

Whether the refusal of a trial court to permit individual voir dire of prospective jurors constitutes an abuse of discretion necessarily depends upon the facts of the particular case. *See generally Annot.*, 73 A.L.R.2d 1187, § 7 (1960 & Later Case

Service). In *State v. Pendry*, 159 W.Va. 738, 227 S.E.2d 210 (1976), *overruled, in part, on other grounds, Jones v. Warden, W.Va. Penitentiary*, 161 W.Va. 168, 241 S.E.2d 914 (1978), defense counsel, after first unsuccessfully challenging four jurors for cause, requested leave of court to question each of the four jurors in chambers or out of the presence of the remaining jurors, so that he might more fully explore with each of the jurors possible areas of prejudice that had been revealed during collective voir dire of the jury panel.[7] Rather than granting defense counsel's request, the trial court addressed a general inquiry to the entire panel asking in substance whether any of the jurors felt that they could not try the case entirely on the evidence and the instructions of the court and render a fair and impartial verdict.

On appeal, Pendry contended that the trial court erred by denying defense counsel's request to examine the four jurors individually. While not reversing on this point, we held that the procedure followed by the trial court

> although unobjectionable, may not have been as desirable as allowing a procedure which would have permitted possible matters of bias or prejudice to be more fully explored so that there could have been no question of lack of qualification on the part of any juror and so that peremptory challenges might have been more intelligently made.

159 W.Va. at 748, 227 S.E.2d at 217–218.

■ In *State v. Pratt, supra*, collective voir dire of the jury panel revealed four jurors who were related by blood or marriage to, or a close friend of, a law enforcement officer. Defense counsel requested the trial court to ask additional questions of these jurors based upon their responses

---

6. W.Va.R.Crim.P. 24(a) provides:

   The court may permit the defendant or his attorney and the attorney for the State to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the State to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such

additional questions by the parties or their attorneys as it deems proper.

7. All four of the jurors admitted that they knew members of the victim's family. One juror admitted she had spoken with various persons, including police officers, about the case. Another juror admitted having discussed the case at work. The two others admitted that they had heard general talk about the case.

to prior questions. The court refused to submit individual questions to the specific jurors, refused to excuse them, and made no further inquiry of the panel concerning relationships with law enforcement officers. On appeal, we held that it was an abuse of discretion and reversible error for the court to refuse to question, individually, those jurors who had disclosed relationships or close associations with law enforcement officers, or alternatively, to excuse them. Syllabus point two of *Pratt* states: "Jurors who on *voir dire* of the panel indicate possible prejudice should be excused, or should be questioned individually either by the court or by counsel to precisely determine whether they entertain bias or prejudice for or against either party, requiring their excuse."

■ In this case the jury panel was asked questions on voir dire which revealed numerous relationships which presented the potential for bias or prejudice. After illiciting this information, counsel requested individual voir dire to determine if the admitted relationships created impermissible bias or prejudice. The court refused counsel's request for individual voir dire, despite its initial indication that individual voir dire would be permitted if warranted. *State v. Pratt, supra,* and *State v. Pendry, supra,* clearly indicate that it is an abuse of discretion not to permit individual questioning when a juror reveals a relationship that suggests potential for bias or prejudice.

While none of the jurors in this case answered affirmatively when asked collectively by defense counsel if their relationships, acquaintances, or exposure to newspaper articles would influence their decision in the case, the jurors' responses cannot be taken as conclusive on the issue. As the Court stated in *State v. Pendry, supra* 159 W.Va. at 747, 227 S.E.2d at 217:

It may not always be sufficient merely to ask a juror whether he is sensible of any bias or prejudice and to accept either his denial or claim of bias or prejudice

merely because he says it. The existence of bias or prejudice or other lack of qualification is addressed in the first instance to the trial court. Although the juror's opinion is entitled to consideration, it need not always be taken to be conclusive. It may frequently become necessary for the trial court or counsel to go into particular matters which may be the subject of biased or prejudiced views in order to determine whether the juror in fact, even without his own knowledge, may have a demonstrable bias or prejudice which would operate to the disadvantage of one of the litigating parties.

This Court has consistently held that a meaningful and effective voir dire of the jury panel is necessary to effectuate the fundamental right to a fair trial by an impartial and objective jury. *See, e.g., State v. Schrader,* 172 W.Va. 1, 302 S.E.2d 70 (1982); *State v. Helmick,* 169 W.Va. 94, 286 S.E.2d 245 (1982); *State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559 (1981); *State v. Payne,* 167 W.Va. 252, 280 S.E.2d 72 (1981); *State v. Pratt, supra; State v. Pendry, supra; West Virginia Human Rights Comm'n v. Tenpin Lounge, supra; State v. Wilson, supra; State v. West,* 157 W.Va. 209, 200 S.E.2d 859 (1973); *State v. McMillion, supra.* Given the gravity of the offense charged in this case, and the demonstrated possibilities for prejudice or bias revealed by counsel's preliminary questions, we believe it was an abuse of discretion and reversible error for the trial court to preclude individual voir dire of the jury panel. Accordingly, the appellant's conviction must be reversed.

### III.

During the investigation of Lilly's death, the authorities obtained a statement from Denver Ash admitting that he, not the appellant, fired the fatal shot.[8] Appellant's counsel received a copy of Ash's statement as a result of discovery prior to trial. During the appellant's trial, defense counsel sought to place portions of Ash's confes-

---

8. The relevant portion of Ash's statement is: "I looked at Bob [Lilly] lying on the ground and saw him move and I was standing very close to him and he had the pistol in his hand. I pointed the rifle at Bob with one hand and fired."

sion in evidence through cross-examination of Trooper John W. Frum.

The State initially objected to admission of portions of the statement, contending that the statement should be read in its entirety. At this time the trial court interjected that the statement went beyond the scope of Trooper Frum's direct examination. The judge instructed defense counsel that the appellant could call Trooper Frum as its own witness, but could not question the witness concerning the statements during cross-examination. Defense counsel immediately requested permission to make Trooper Frum a defense witness. The trial court replied, "Not at this time."

Counsel for the appellant attempted to place Ash's statement in evidence a second time while cross-examining another prosecution witness, Trooper L.E. Lanham. The court, *sua sponte*, foreclosed questioning concerning Ash's statement on the grounds that such evidence would be inadmissible hearsay. The State did not object to admission of Ash's statement, provided that it would be admitted in its entirety. The appellant assigns as error the trial court's ruling preventing cross-examination of Trooper Lanham concerning Ash's statement. He contends that Ash's confession is exculpatory evidence which he is entitled to place before the jury as an admission against interest exception to the hearsay rule.

Our law governing this issue is stated in *State v. Williams*, 162 W.Va. 348, 249 S.E.2d 752 (1978). The defendant in *Williams* was convicted of armed robbery. On appeal he contended that the trial court erred by refusing to admit testimony from a witness who, while in jail, had heard another prisoner confess to the robbery without mentioning the defendant. Such evidence, constituting an admission against penal interest, was previously inadmissible under this Court's ruling in *State v. Poe*, 69 W.Va. 260, 71 S.E. 177 (1911), where we held in syllabus point one, "Evidence that a person made a statement that he, and not the accused, committed the crime, would not be admissible on a trial of the accused, and therefore is not ground for a new trial."

However, in *Williams*, we rejected the blanket prohibition contained in *Poe*, and adopted the more flexible approach of Rule 804(b)(5) of the Federal Rules of Evidence, which focuses on the reliability of the extra-judicial statements. Syllabus point two of *Williams* provides:

> Hearsay evidence which is against the penal interest of the extra judicial declarant is admissible even though it does not fall within a recognized West Virginia exception to the hearsay rule if it possesses sufficient indicia of reliability to satisfy the court that it is trustworthy in accordance with the following rule:
>
> A statement has circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

In order to invoke this exception to the hearsay rule it must be shown that the out-of-court declarant is unavailable by reason of "death, insanity, absence from the jurisdiction, pleading of the Fifth Amendment, or other reasons outside the control of the proferring party ...." *State v. Williams*, *supra* 162 W.Va. at 355, 249 S.E.2d at 756.

In this case, the appellant made no effort to call either Trooper Frum or Trooper Lanham during presentation of the defense's case in order to place Ash's statement into evidence. Neither did defense counsel show or attempt to show that Ash was unavailable to testify himself. Accord-

ingly, we find no error in the trial court's refusal to permit counsel to elicit Ash's confession upon cross-examination of the prosecution's witnesses. If, upon retrial, the appellant satisfies the criteria of *Williams,* the trial court, upon a proper finding of trustworthiness, may permit Ash's confession to be admitted into evidence. Of course, should Ash testify to the facts himself, no hearsay question would be presented. *See State v. Adkins,* 170 W.Va. 46, 289 S.E.2d 720 (1982).

### IV.

The appellant next contends that it was error for the trial court to permit the State to introduce a .22 caliber bolt action rifle into evidence, and to permit the State to exhibit and demonstrate the use of a Colt AR–15 rifle to the jury. The appellant contends that there was no evidence linking either weapon to the appellant or the occurrences that resulted in Lilly's death. A review of the record indicates that this assignment of error is without merit.

There was ample evidence below to support the admission of the .22 caliber rifle into evidence. This rifle was found inside the Glen Johnson residence, a cabin within close proximity to the site of the shooting. Both the appellant and Ash were seen at the cabin shortly before they were taken into custody by law enforcement officers. Moreover, two witnesses testified at trial that they had seen Ash with a rifle similar in appearance to that introduced into evidence.

Our standard of review on appeal for the alleged erroneous admission or exclusion of evidence is well established: "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus Point 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955). *See also* Syllabus Point 3, *State v. Oldaker,* 172 W.Va. 258, 304 S.E.2d 843 (1983); Syllabus Point 2, *State v. Rector,* 167 W.Va. 748, 280 S.E.2d 597 (1981); Syllabus Point 5, *Casto v. Martin,* 159 W.Va. 761, 230 S.E.2d

722 (1976). We do not believe the trial court abused its discretion with regard to admission of the .22 caliber rifle.

The authorities did not recover the military-type automatic weapon which the testimony of several witnesses placed in the hands of the appellant prior to and during the gunfight with Lilly. Thus, the State made no claim that the Colt AR–15 rifle exhibited to the jury was the actual weapon used by the appellant, and did not seek its admission into evidence. Rather, it was used by prosecution witnesses as an aid in demonstrating the manner in which spent cartridges would be ejected. Thus, from the placement of spent cartridges found at the scene of the gunfight, the jury could infer the location of the appellant during the confrontation with Lilly. Several witnesses testified that the appellant had in his possession a rifle substantially similar to the Colt AR–15. In addition, the appellant, in a statement given to law enforcement officials, admitted that he used an AR–15 rifle in the shooting. In these circumstances, we believe that the probative value of the rifle outweighed any prejudicial effect on the jury. Accordingly, we find no abuse of discretion on the part of the trial court in permitting the State to use this rifle during examination of prosecution witnesses.

The appellant further asserts that the prosecution impermissibly exhibited the AR–15 rifle during his closing argument to inflame the jury and prejudice them against him. We are unable to verify from the printed record the assertions of counsel on this point. Moreover, because the appellant's conviction must be reversed upon other grounds, we find it unnecessary to rule on this issue. However, we caution the lower court that it should cautiously examine the use during closing arguments of exhibits which have not been admitted into evidence. Demonstrative exhibits cannot be offered solely to appeal to the emotions or passions of the jury, and depending upon the impact such exhibits may reasonably have on a jury, their use may rise to the level of prejudicial error. *See general-*

ly F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* 453 (1978).

## V.

■ In his next assignment of error, the appellant protests the refusal of the trial court to give five instructions proffered by the defense.[9] A review of the record indicates that three of the proffered instructions were covered by instructions given by the court, and were therefore properly refused.[10] It is well established in West Virginia that, "[i]t is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court." Syllabus Point 20, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966). *See also State v. Helmick*, 169 W.Va. 94, 286 S.E.2d 245 (1982); *State v. Shaffer*, 138 W.Va. 197, 75 S.E.2d 217 (1953); *State v. Blankenship*, 137 W.Va. 1, 69 S.E.2d 398 (1952) *overruled, in part, on other grounds, State v. McAboy*, 160 W.Va. 497, 236 S.E.2d 431 (1977); *State v. Lewis*, 133 W.Va. 584, 57 S.E.2d 513 (1949).

■ Of the remaining two instructions, the first was an elaboration upon the reasonable doubt standard necessary to con-

9. Counsel also alleges as error the refusal of the trial court to give a standard directed verdict instruction. However, this alleged error is neither argued nor briefed. Consequently, we do not address it. *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982).

10. Defendant's Instructions Nos. 4, 5, and 16 presented the theory of self-defense. Instruction No. 4 states:

The Court instructs the jury that as to the imminency of the danger which threatened Nelson Ashcraft, and the necessity of shooting at Robert Andrew Williams, alias Robert Lilly, after he had the gun in his possession, as shown by the evidence, Nelson Ashcraft is the judge; and the jury must pass upon Nelson Ashcraft's action in the premises, viewing said action from Nelson Ashcraft's standpoint at that time; and if the jury believes from all the facts and circumstances in the case, viewed from the standpoint of Nelson Ashcraft at the time *he shot Robert Williams, as shown by* the evidence, that he had reasonable grounds to believe, or did believe the danger imminent, and that such conduct of Nelson Ashcraft was necessary to protect himself from death or bodily harm, he was excusable for shooting Robert Williams, in self-defense, and the jury should find the defendant not guilty. Defendant's Instruction No. 5 states:

The Court instructs the jury that the evidence in this case that the conduct of Robert Andrew Williams, alias Robert Lilly, before he met his death was such as to give Nelson Ashcraft reasonable grounds to believe, and he actually did believe, that he was in danger of losing his life or of suffering great bodily harm at the hands of Williams, and if you further believe that while he, Ashcraft, was under the influence of that belief, he seized a rifle and shot at and wounded Robert Williams in the leg in an effort to repel an attack upon him and if you further believe that in doing so Nelson Ashcraft used only such force as appeared to him at that time and under those circumstances to be reasonable and necessary to protect himself from bodily harm and thereafter withdrew from the fight, then such action by Nelson Ashcraft is excusable under the law of this State and you should find him not guilty of the crime charged in this indictment.

Defendant's Instruction No. 16 states:

The Court instructs the jury that if you believe from the evidence in this case that Robert Andrew Williams' conduct at or immediately prior to the time he was killed was of such violence as to make it appear to Nelson Ashcraft that he manifestly intended to take his life or do him some great bodily harm, and that the danger was imminent and impending, then in that case, Nelson Ashcraft was not bound to retreat but had the right to stand his ground, repel force with force and if need be, kill Robert Andrew Williams to save his own life to prevent himself from receiving bodily injury, and it is not necessary that it shall appear to the jury to have been necessary.

These proffered instructions were adequately covered by the following charge given by the court:

You are further instructed that a person has a right to repel force by force in the defense of his person, and if in so doing he used only such force as the necessity, or apparent necessity, of the case required, he is not guilty of any offense, though he kills his assailant in so doing. In any case, the necessity relied on to excuse the killing must not have arisen out of the defendant's own misconduct.

Apprehension of danger, to justify a homicide, must not be based alone on surmises, but there must be coupled therewith some aid on the part of the party, from whom danger was apprehended, evidencing an immediate intention to carry into execution his threats or designs, and the jury are to judge of the reasonable grounds for such apprehension on the part of the defendant from all the facts and circumstances, as they existed at the time of the killing.

vict a criminal defendant.[11] We have consistently discouraged the use of instructions which attempt to define reasonable doubt beyond the standard charge. *See, e.g., State v. Helmick, supra; State v. Keffer,* 168 W.Va. 59, 281 S.E.2d 495 (1981); *State v. Goff,* 166 W.Va. 47, 272 S.E.2d 457 (1980); *State v. Starr,* 158 W.Va. 905, 216 S.E.2d 242 (1975); *State v. Powers,* 91 W.Va. 737, 113 S.E. 912 (1922), *overruled on other grounds, State v. Petry,* 166 W.Va. 153, 273 S.E.2d 346 (1980). Consequently, we find no error in the refusal of this instruction.

█ The second of the remaining instructions attempted to explain the intent necessary to convict a defendant as an aider and abettor, and to relate such intent to the appellant's theory of self-defense.[12] It was refused by the trial court apparently on the basis that there was no evidence to support a theory of aiding and abetting. The appellant objects to the refusal of the instruction on the basis that it removed from the jury the defense theory that the appellant had withdrawn from the gunfight after he had shot Lilly in the legs in self-defense, and thus, shared none of Ash's intent to murder Lilly. The appellant's theory that he acted in self-defense and possessed no intent to kill was adequately presented in the court's charge.[13] Consequently, we find no error in refusal of the proffered instruction. *State v. Hamric, supra.*

## VI.

The appellant contends that it was error for the court to refuse to instruct the jury or submit a verdict form on the lesser included offense of involuntary manslaughter. The elements of the offense of involuntary manslaughter are stated in syllabus point seven of *State v. Barker,* 128 W.Va. 744, 38 S.E.2d 346 (1946): "The offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another." *See also State v. Cobb,* 166 W.Va. 65, 272 S.E.2d 467 (1980). The appellant argues that from the evidence, the jury could have believed that the appellant "accidently or negligently shot Lilly while brandishing a weapon in self-defense."

█ This argument is without merit. There was no evidence adduced below to support an involuntary manslaughter instruction. Rather, the evidence indicates that Lilly was shot between the eyes at close range while wounded and lying on the ground after he had been disarmed. Given

**11.** The instruction states: "The Court further instructs the jury that if any one single material fact, proved to the satisfaction of the jury, is inconsistent with the guilt of the defendant, this *is sufficient to raise a reasonable doubt, and the* jury should find the defendant not guilty."

**12.** The instruction states:

The Court instructs the jury that to constitute an aider and abettor, it is essential that the aider and abettor should share the criminal intent of the principal party who committed the offense. The Court further instructs the jury that whenever a reasonable doubt exists as to the person's intention, he cannot be found guilty as an aider and abettor.

Therefore, if you believe from the evidence in this case that when the defendant, Nelson Ashcraft, disarmed the deceased, Robert Andrew Williams, alias Bob Lilly, he was doing so for the purpose of protecting himself and others from death or serious bodily injury and that said defendant did not intend to inflict further physical harm upon the deceased and if you further believe from the evidence that Nelson Ashcraft did not inflict

the fatal wound upon Robert Andrew Williams and that said fatal wound was inflicted by Denver Ash and that said Nelson Ashcraft did not share in the criminal intent of Denver Ash when he shot said Robert Andrew Williams, then you cannot find the defendant Nelson Ashcraft guilty as an aider and abettor.

**13.** *See* note 10, *supra,* for the charge given by the trial court concerning self-defense. The court's charge concerning the finding of intent necessary to convict as an aider and abettor to homicide states:

You are further instructed that if two or more persons share a common intent and purpose to commit a homicide and each performs some act in the commission of said homicide, one doing one thing and the other something else and said offense is committed, then each of such persons may be found guilty of said offense as charged.

The latter instruction is the subject of the appellant's seventh assignment of error, and is discussed in more detail, *infra.*

the lack of evidence supporting the instruction, it was not error for the trial court to refuse it. As this Court specifically stated in syllabus point six of *State v. Woodrow*, 58 W.Va. 527, 52 S.E. 545 (1905): "Refusal of an instruction, on a trial for murder, giving the findings in the power of the jury, including one of involuntary manslaughter, is not error, when no evidence in the case tends to show that degree of homicide. Such instruction should not be given."

### VII.

In his seventh assignment of error, the appellant objects to the giving of the following instruction:

You are further instructed that if two or more persons share a common intent and purpose to commit a homicide and each performs some act in the commission of said homicide, one doing one thing an the other something else, and said offense is committed, then each of such persons may be found guilty of said offense as charged.

The appellant argues that this instruction forces the jury "to conclude that [the appellant] shared Ash's intent to kill Lilly when the jury could just as easily have concluded that [the appellant] did not intend to kill Lilly, but wounded and disarmed him all with the intent to defend himself against harm." The State on the other hand contends that the instruction is a correct statement of law, and is "wholly unobjectionable."

We appreciate the appellant's concern that the instruction in question may have been confusing and misleading to the jury. While the instruction is, generally speaking, a correct statement of law,[14] it fails to relate the law set out in the instruction to the evidence. We addressed this issue recently in *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389, 397 (1982), where we stated: "[A]n instruction embodying an abstract proposition of law without in any way connecting it with the evidence, or indicating which facts the jury must find from the evidence in order to make it applicable to the case, ought not be given." We further noted, however, that "it is not reversible error for a trial court to give an abstract instruction where the instruction is not misleading or inapplicable to the case." Syllabus Point 7, *State v. Gangwer, supra.*

The possible confusion resulting from the giving of this instruction could have been cured by the giving of Defendant's Instruction No. 18, which was refused below, but which refusal is not assigned as error on appeal.[15] While we do not reverse on this point, we caution the trial court that, should the same circumstance occur upon retrial, an objection to the challenged instruction should be sustained.

### VIII.

Finally, the appellant asserts that one of the State's witnesses testified falsely, either intentionally or through ignorance, that no copper-jacketed .22 caliber rimfire ammunition is manufactured, when in fact .22 caliber rimfire bullets of the magnum load are manufactured.[16] The rele-

---

14. A more artful statement of this black letter law is found at 40 C.J.S., *Homicide*, § 9d (1944): "One is not responsible for a homicide committed by another unless he shared the criminal intent of the actual slayer, and this is so notwithstanding he had some previous difficulty with the victim. The intent may, however, be formed at the scene of the homicide."

15. Defendant's Instruction No. 18 states:

The Court instructs the jury that if you believe from the evidence in this case that when the defendant, Nelson Ashcraft, disarmed the deceased, Robert Andrew Williams, alias Bob Lilly, he was doing so for the purpose of protecting himself and others from death or serious bodily injury and that said

defendant did not intend to inflict further physical harm upon the deceased; and if you further believe from the evidence that Nelson Ashcraft did not inflict the fatal wound upon Robert Andrew Williams and that said fatal wound was inflicted by Denver Ash and that said Nelson Ashcraft did not share in the criminal intent of Denver Ash when he shot said Robert Andrew Williams, then you cannot find the defendant Nelson Ashcraft guilty and you should acquit him.

16. The import of this evidence is apparent when considered together with the testimony of the medical examiner that the fatal wound was caused by copper-jacketed ammunition. Since the testimony indicated that Ash used a .22

vance of this allegation on appeal is questionable. The appellant does not seek a new trial on the basis of newly discovered evidence. Neither are unsupported allegations of perjury generally considered grounds for appeal. Moreover, it appears from the record that this same witness testified at the appellant's preliminary hearing that "a .22 magnum rimfire used a jacketed bullet, also." Yet defense counsel failed to cross-examine the witness concerning these apparent inconsistent statements at trial. Given these considerations, we decline to discuss this "assignment of error" further.

In summary, because the trial court abused its discretion in denying the appellant's request for individual voir dire of the jury panel, we reverse the appellant's conviction, and remand this case for proceedings consistent with this opinion.

Reversed and remanded.

caliber rifle, the jury could conclude that the appellant, whose Colt AR–15 fired copper-jacket-

ed bullets, fired the fatal shot, rather than Ash.