369 S.E.2d 464

**STATE of West Virginia**

v.

**Cleo DUNCAN.**

**No. 17467.**

Supreme Court of Appeals of West Virginia.

April 22, 1988.

---

Travers R. Harrington, Jr., Fayetteville, for Cleo Duncan.

Mary Rich Maloy, Charleston, for State.

BROTHERTON, Justice:

Cleo Duncan appeals her conviction by a Fayette County jury of the unlawful disinterment or displacement of a dead human body in violation of W.Va.Code § 61–8–14 (1984). She raises two errors relating to W.Va.Code § 61–8–14: First, that unlawful disinterment implies a decent burial as a prerequisite; and second, that W.Va.Code § 61–8–14 is unconstitutionally vague. The appellant also assigns as error the trial court's failure to give the jury instructions defining a principal in the second degree and an aider and abettor, and the trial court's failure to conduct individual *voir dire*.[1] For the reasons stated below, we find no reversible error, and therefore affirm.

During the early morning hours of January 29, 1983, James Duncan arrived at his rural Fayette County home. Duncan lived with his wife, Cleo, his infant daughter and Cleo Duncan's sons from a previous marriage, Jerry Raines, Joey Raines, and Bobby Raines. Complaining because the fire in the wood stove had gone out and because he was hungry, Duncan woke the appellant and instructed her to prepare him something to eat. Upset because the food was not heated adequately, Duncan threw

---

**1.** The appellant assigns numerous other errors, all of which we find to be without merit and do not address in this opinion.

the plate of food across the room and chased after his wife. The appellant fled outside, but Duncan brought her back inside. By this time the commotion had awakened Jerry Raines, the appellant's oldest son, who interceded on her behalf by asking Duncan to leave his mother alone. Duncan then turned his anger toward Jerry and chased him outside.

Eventually, the family congregated in the kitchen, where Duncan, shaking a kitchen knife, lectured the boys on how to keep the fire going in the wood stove. Duncan then took his mother-in-law's gun from behind the kitchen stove and waved it in front of the boys. The appellant's mother, Dorothy Grubb, who lived next door, arrived and took the gun from Duncan. A shot was fired, killing Duncan.

A decision was made to bury Duncan in the backyard, and Mrs. Grubb instructed Jerry and Joey to dig the hole. Mrs. Grubb and Jerry placed Duncan's body in the hole. Jerry and the appellant then drove Duncan's truck to nearby Prince and ran it over a hill to the edge of the river to make it appear that Duncan had been involved in an accident. The next day the appellant reported Duncan missing to the State Police. A search for Duncan's body ensued.

Motivated by the desire for Duncan to have a decent burial, on January 31, the family decided to put Duncan's body in the river so it would be found by the police in their dragging operations. The appellant instructed Jerry and Joey to dig up Duncan's body. Mrs. Grubb, however, feared that when Duncan's body was found the bullet would be traced to her. Accordingly, Mrs. Grubb cut into Duncan's chest with a knife, removed the heart and lungs, but was unable to find the bullet.

The appellant, Mrs. Grubb, and Jerry then proceeded to Wiggins Bridge near Hinton, West Virginia, where they attempted to throw Duncan's body off the bridge. However, Duncan's foot became entangled in the superstructure of the bridge, leaving his body hanging over the river. While Jerry was underneath the bridge trying to dislodge the body, headlights appeared on the bridge. Realizing that the vehicle was a Hinton police car, the appellant got back into her car and drove off.

Unable to continue the cover-up, the appellant decided to turn herself in to the authorities. On the way to the police the next morning, the appellant was met by two State Police officers and placed under arrest.

The appellant was tried on a two-count indictment, count one charging her with murder, and count two charging her with unlawful disinterment. On August 14, 1985, the Fayette County jury acquitted the appellant on count one, but found her guilty of the unlawful disinterment of a dead human body. The appellant was sentenced to a prison term of two-to-five years at the West Virginia State Prison for Women at Alderson, West Virginia.

I.

■ The appellant argues first that "disinterment" in W.Va.Code § 61–8–14 (1984) implies prior burial in the sense of a decent burial. She argues that Duncan's body was merely hidden in the ground, not decently buried, and that, therefore, it could not be subject to unlawful disinterment under W.Va.Code § 61–8–14.[2] We disagree.

West Virginia Code § 61–8–14 provides:

> If any person unlawfully disinter or displace a dead human body, or any part of a dead human body, which shall have been placed or deposited in any vault, mausoleum, or any temporary or permanent burial place, he shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than two nor more than five years.

West Virginia Code § 61–8–14 contains no requirement that a body be decently or lawfully buried before it can be subjected to unlawful disinterment. Rather, the language "any temporary or permanent burial

---

**2.** Arguing that "burial place" in W.Va.Code § 61–8–14 implies more than a body covered with dirt, the appellant would have this Court view the hole into which Duncan's body was placed as a "hiding place," not a "burial place."

place" indicates a legislative desire not to distinguish between the types of graves which might be subject to unlawful disinterment. While the hole in the backyard indeed may have been a hiding place, it was also a burial place. The burial place became a *temporary* burial place only because the family decided to recover the body and deposit it in a different place so it could be given a "proper burial."[3] However, "[t]he unauthorized disinterring of the body of a deceased human being is an indictable offense both at common law and by statute regardless of the motive or purpose for which the act is done." *Davis v. State,* 61 Ga.App. 379, 6 S.E.2d 736 (1939). Thus, we cannot excuse the appellant's actions on the basis of her desire to provide Duncan's body a decent burial.[4] We, therefore, must reject the appellant's first attack on W.Va.Code § 61–8–14.

■ In her second attack upon W.Va. Code § 61–8–14, the appellant argues that the statute is unconstitutionally vague and fails to fully and fairly give a person notice that his conduct is prohibited. In *State v. Flinn,* 158 W.Va. 111, 208 S.E.2d 538 (1974), the Court set forth the standard for measuring a criminal statute for certainty and definiteness: "A criminal statute must be set out with sufficient definiteness to give a person of ordinary intelligence fair notice that his contemplated conduct is prohibited by statute and to provide adequate standards for adjudication." Syl. pt. 1, *State v. Flinn,* 158 W.Va. 111, 208 S.E.2d 538 (1974). *See United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954); *Connally v. General Constr. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). However, "[i]m-

possible standards of specificity are not required." *Jordan v. De George,* 341 U.S. 223, 231, 71 S.Ct. 703, 708, 95 L.Ed. 886 (1951). "Criminal statutes, which do not impinge upon First Amendment freedoms or other similarly sensitive constitutional rights, are tested for certainty and definiteness by construing the statute in light of the conduct to which it is applied." Syl. pt. 3, *State v. Flinn,* 158 W.Va. 111, 208 S.E.2d 538 (1974). *See United States v. Powell,* 423 U.S. 87, 92, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975). In this case, the body of James Duncan was placed in a hole in the appellant's backyard dug especially for that purpose. He was covered with dirt and remained there for approximately 72 hours. At the appellant's instruction, Jerry and Joey Raines removed Duncan's body from the hole in the backyard for the purpose of throwing it into the river.

The clear and unambiguous language of W.Va.Code § 61–8–14 gives a person of ordinary intelligence fair notice that the disinterment of a dead human body from any temporary or permanent burial place constitutes a felony punishable by a two-to-five year prison term. We, therefore, find that W.Va.Code § 61–8–14 is not unconstitutionally vague and that the appellant had fair notice that her conduct was prohibited by statute. "When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment." Syl. pt. 3, *Willis v. O'Brien,* 151 W.Va. 628, 153 S.E.2d 178, *cert. denied,* 389 U.S. 848, 88 S.Ct. 71, 19 L.Ed.2d 116 (1967).[5]

---

**3.** We find no merit in the appellant's argument that if any covering of a dead body with earth is a burial from which the removal is a felony, then the retrieval of bodies after an underground mine disaster or the removal of bodies buried in a mass murderer's basement would be a prohibited act. The burial in this case, which involved the placement of a body after death, is different from accidents where a victim is buried alive, such as mine disasters, mud slides, and floods. Further, removal of bodies from a basement, when done by the proper authorities, is distinguishable from and raises a question

different from the circumstance that we address today.

**4.** *Cf. State v. Hartzler,* 78 N.M. 514, 433 P.2d 231 (1967). In *Hartzler,* the appellant was convicted of "indecent handling of a dead body." *Id.* 433 P.2d at 232. The court concluded that it was immaterial that the appellant may have acted out of sincere motives and with no evil intent and refused to excuse his actions on the basis of his religious beliefs. *Id.* 433 P.2d at 235.

**5.** We also reject the appellant's third attack on W.Va.Code § 61–8–14, that the punishment pro-

## II.

■ The appellant argues that because the only evidence showed that she was a principal in the second degree, and because the jury was instructed only as to the elements of a principal in the first degree, the jury's verdict was not supported by the evidence. At trial, the State offered aiding and abetting instructions.[6] At an *in camera* proceeding, the trial court and counsel for both sides discussed whether the court should give the instructions in view of this Court's decision in *State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980). In *Petry*, this Court abolished the distinction among principals in the first degree, principals in the second degree, aiders and abettors, and accessories at the indictment stage. The *Petry* Court noted that the historical foundation for any distinction between principals in the first and second degrees has been completely eroded. *Id.* 166 W.Va. at 159, 273 S.E.2d at 350. It held that "a general indictment as a principal in the first degree shall be sufficient to sustain a conviction regardless of whether the evidence demonstrates that the defendant was a principal, aider and abettor, or accessory before the fact." *Id.* 166 W.Va. at 162, 273 S.E.2d at 352.

■ In the instant case, it was decided that the State would withdraw its proposed instructions and that the point would be argued to the jury.[7] The appellant asserts that while under *Petry* a defendant need not be indicted as a principal in the second degree, the court must give the jury an instruction defining principal in the second degree where the facts show that the accused did not actually perpetrate the criminal act. Jury instructions as to parties to crime benefit the State, not the defendant, because absent such an instruction, the jury may conclude incorrectly that a conviction is warranted only if the facts show that the accused actually perpetrated the criminal act. *See Romo v. State*, 568 S.W.2d 298, 302 (Tex.Crim.App.1978). Therefore, aiding and abetting instructions, when offered, are proper where the evidence supports a finding that the accused, charged as a principal in the first degree, was a principal in the second degree. In the present case, however, the jury found the appellant guilty in the absence of an instruction defining a principal in the second degree. Accordingly, any error committed in failing to give the jury such an instruction benefited the appellant and, therefore, was harmless.

■ Further, any error in failing to instruct the jury as to a principal in the second degree was harmless because the appellant was subject to the same punishment whether the jury viewed her role in the disinterment of Duncan's body as that of a principal in the first degree or a principal in the second degree.[8]

■ We also reject the related argument that the State was required to elect between prosecuting the appellant as a principal in the first degree or as a principal in the second degree. *Cf. State v. Ashcraft*, 172 W.Va. 640, 309 S.E.2d 600 (1983). In

vided for in the statute is unconstitutionally disproportionate.

6. The terms "principal in the second degree" and "aider and abettor" are synonymous. *See State ex rel. Brown v. Thompson*, 149 W.Va. 649, 142 S.E.2d 711 (1965), overruled on other grounds, *State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980).

7. This case was tried before this Court's decision in *State v. Reedy*, 177 W.Va. 406, 352 S.E.2d 158 (1986). In *Reedy*, this Court noted that prior to *Petry*, because of the distinction among principals, aiders and abettors, and accessories, a trial court could not give instructions on aiding and abetting unless aiding and abetting was charged in the indictment. Recognizing that the holding in *Petry* "explicitly abolished the distinctions between principals in the first degree and aiders and abettors at the indictment stage," the *Reedy* Court concluded that "the prohibition against aiding and abetting instructions in instances where the indictment only charges the defendant as a principal in the first degree has also been abolished." *Reedy*, 177 W.Va. at 415, 352 S.E.2d at 167. This Court's decision in *Reedy*, therefore, permits aiding and abetting instructions when a defendant is charged as a principal in the first degree.

8. West Virginia Code § 61–11–6 (1984) provides in relevant part:

In the case of every felony, every principal in the second degree, and every accessory before the fact, shall be punishable as if he were the principal in the first degree.

*Ashcraft,* the trial court denied a portion of a defendant's bill of particulars which would have required the State to specify whether it would prosecute a defendant charged with first-degree murder as a principal in the first degree or a principal in the second degree. *Id.* 172 W.Va. at 646, 309 S.E.2d at 606. On appeal, it appeared to the Court that "the appellant, through the discovery process, attempted to force the prosecution to elect one of two possible factual theories surrounding the degree of involvement of the appellant in [the victim's] death." *Id.* 172 W.Va. at 646, 309 S.E.2d at 606–07. Reasoning that "the resolution of factual disputes in a criminal trial is a function of the jury, not of the prosecutor," this Court held that the trial court did not abuse its discretion in denying that portion of the appellant's motion for a bill of particulars. *Id.* 172 W.Va. at 646–647, 309 S.E.2d at 607. Although in the present case we do not address the issue of election in the context of the discovery process, we find the reasoning of the *Ashcraft* Court applicable to the facts before us. Forcing the State to elect between possible factual theories surrounding the appellant's degree of involvement in the unlawful disinterment of the body of James Duncan would have invaded the fact finding function of the jury. We, therefore, find no error in the State's failure to elect between prosecuting the appellant as a principal in the first degree and a principal in the second degree.

### III.

■ At a pre-trial conference, the appellant moved for individual *voir dire* of the prospective jurors due to the media attention the case had received. The trial court denied the motion at that time, stating that:

> [W]e have to wait until we start the trial and get into the *voir dire* of the panel and see how it goes, and I may permit some individual *voir dire,* but, how much, I wouldn't be in a position to say at this time.

R. at 13. During *voir dire* of the panel, prospective jurors who indicated that they had read about the case in a newspaper or had heard about it on television news were asked *individually* by the trial court whether, as a result of their exposure to media coverage of the case, they had formed an opinion as to the guilt or innocence of the appellant.[9] The one prospective juror who responded affirmatively was questioned individually by the trial court, out of the presence of the other prospective jurors, and dismissed from the panel. Moreover, at the conclusion of *voir dire,* the trial court asked the appellant's counsel if he had any additional questions. The appellant's counsel replied, "I'm pleased with the collection of the jury. We have no questions." R. at 31.

"Jurors who on *voir dire* of the panel indicate possible prejudice should be excused, or should be questioned individually either by the court or by counsel to precisely determine whether they entertain bias or prejudice for or against either party, requiring their excuse." Syl. pt. 2, *State v. Pratt,* 161 W.Va. 530, 244 S.E.2d 227 (1978). "The trial court's exercise of discretion in determining the extent of inquiry on *voir dire* is not normally subject to review on appeal. However, the court's discretion is limited by the requirement of due process, and may be reviewed in a case of abuse." *State v. Ashcraft,* 172 W.Va. 640, 309 S.E.2d 600, 608 (1983). On the record before us we, therefore, find that the trial court did not abuse its discretion in denying the appellant's motion for blanket individual *voir dire.*

For the foregoing reasons, the judgment of the Circuit Court of Fayette County is affirmed.

Affirmed.

NEELY, Justice, dissenting:

I dissent because it does not appear to me that burying a body and covering it with dirt *exclusively* to conceal it is the

---

**9.** *Cf. State v. Ashcraft,* 172 W.Va. 640, 309 S.E.2d 600, 609 (1983) (where no juror answered affirmatively when asked *collectively* whether exposure to newspaper articles would influence decision, jurors' responses cannot be taken as conclusive on issue); *cf. also United States v. Pomponio,* 563 F.2d 659, 666 (4th Cir.1977) ("[g]eneral allegations of damaging publicity are sufficiently dealt with by questions and admonitions addressed to the panel as a whole").

 

type of "temporary or permanent burial place" contemplated by *W. Va. Code,* 61–8–14 [1984]. If the appellant in this case is guilty of anything, she is guilty of being a principal or accessory to homicide. We are stretching the plain intent of this statute to catch the appellant in its net. "Penal statutes must be strictly construed against the State and in favor of the defendant."

*State ex rel. Carson v. Wood,* 154 W.Va. 397, 175 S.E.2d 482 (1970).[1]

---

1. *See also, State v. Hager,* 176 W.Va. 313, 342 S.E.2d 281 (1986); *State v. Hodges,* 172 W.Va. 322, 305 S.E.2d 278 (1983); *State v. Vandall,* 170 W.Va. 374, 294 S.E.2d 177 (1982); *State v. Barnett,* 168 W.Va. 361, 284 S.E.2d 622 (1981); *State v. Cole,* 160 W.Va. 804, 238 S.E.2d 849 (1977); *State ex rel. Davis v. Oakley,* 156 W.Va. 154, 191 S.E.2d 610 (1972).